2022 CO 3 The People of the State of Colorado, Petitioner v. Patrick Rau. Respondent No. 20SC583
Supreme Court of Colorado, En banc
January 10, 2022
 1
 
 
 Certiorari to the Colorado Court of Appeals Court of Appeals
 Case No. 18CA2025
 
 2
 
 
 Attorneys for Petitioner: Michael J. Allen, District
 Attorney, Fourth Judicial District Doyle Baker, Senior Deputy
 District Attorney
 
 
 
 Attorneys for Respondent: The Bussey Law Firm, P.C. Timothy
 R. Bussey
 
 
 CHIEF
 JUSTICE BOATRIGHT, JUSTICE MÁRQUEZ, JUSTICE HOOD,
 JUSTICE GABRIEL, JUSTICE HART, and JUSTICE BERKENKOTTER
 joined.
 
 3
 
 
 OPINION
 
 
 
 JUSTICE SAMOUR
 
 
 ¶1
 Colorado's so-called Make My Day law, section 18-1-704.5,
 C.R.S. (2021), addresses the justified use of force against
 intruders in the home. The statute's nickname stems from
 a line in the film Sudden Impact. See People v.
 Alaniz, 2016 COA 101, ¶ 1 n.1, 409 P.3d 508, 510
 n.1 (noting the nickname's origin). In one notable scene,
 a fictional police inspector known as "Dirty Harry"
 points his gun at a robber in a coffee shop and says,
 "Go ahead, make my day," seemingly "daring the
 suspect to give him an excuse to shoot." Dirk Johnson,
 Colorado Journal; 'Make My Day': More
 Than a Threat, N.Y. Times, June 1, 1990, at A14.
 Although section 18-1-704.5 was originally called "The
 Home Protection Bill," its nickname was coined as the
 bill made its way through the legislature. See
 William Wilbanks, The Make My Day Law: Colorado's
 Experiment in Home Protection 1 (1990). The media then
 popularized the nickname as a way to describe, and perhaps
 criticize, the new legislation's broad
 protection.[1] Id.
 
 4
 
 ¶2
 But the nickname is a misnomer. Though wide-ranging, the
 statute's safe harbor in no way permits an occupant of a
 dwelling to, à la Dirty Harry, egg on intruders to do
 something so as to have an excuse to shoot them. Thus, while
 the catchy nickname has stuck around, our preference is to
 refer to the statute by its citation or as the
 "force-against-intruders" statute.
 
 
 ¶3
 Section 18-1-704.5 recognizes that "the citizens of
 Colorado have a right to expect absolute safety within their
 own homes." § 18-1-704.5(1). As pertinent here, it
 provides immunity from criminal prosecution for the use of
 physical force (including deadly physical force) against an
 intruder when certain specified conditions are met.
 See § 18-1-704.5(2)-(3); People v.
 McNeese, 892 P.2d 304, 309 (Colo. 1995). One of those
 conditions is implicated in this appeal: We must decide
 whether the defendant, Patrick Rau, was in a
 dwelling when he shot and killed an intruder in the
 basement of the house where he and his girlfriend rented an
 apartment. A division of the court of appeals concluded that
 the basement, which was accessible to all of the
 building's tenants and contained the building's heat
 and water controls, was part of Rau's dwelling.
 People v. Rau, 2020 COA 92, ¶¶ 1, 17, 490
 P.3d 804, 806, 808. Therefore, it affirmed the district
 court's ruling that Rau was immune from prosecution for
 using deadly physical force against the intruder.
 Id. at ¶ 26, 490 P.3d at 809.
 
 5
 
 ¶4
 Relying on the definition of "dwelling" in section
 18-1-901(3)(g), C.R.S. (2021), we now hold that the basement
 was part of Rau's dwelling because it was part of the
 building that he used for habitation. We view the basement in
 this case in much the same way we viewed the attached garage
 in People v. Jiminez, 651 P.2d 395, 396 (Colo.
 1982). Just as the garage in Jiminez was part of the
 building that was used for habitation, the basement here was
 part of the building that Rau used for habitation. And just
 as some of the usual uses of the garage in Jiminez
 were incidental to and part of the use of the residence
 itself, some of the usual uses of the basement in this case
 were likewise incidental to and part of the use of Rau's
 residence. Accordingly, we affirm the division.
 
 
 I.
 Facts and Procedural History
 
 
 ¶5
 Rau and his girlfriend rented a second-floor apartment in an
 old 19th century Victorian home that had been
 converted into seven apartments.[2] The door to the basement,
 which was just a few feet inside the home's rear
 entrance, was padlocked. However, the residents of all seven
 apartments had keys to the padlock and shared access to the
 basement. Although unfinished, the basement contained a
 central furnace, two hot water heaters, the home's only
 thermostat,
 
 6
 
 and the plumbing infrastructure. In other words, the controls
 for the water and heat supply for all the apartments were
 located in the basement.[3] As well, some of the residents stored
 household items in the basement.
 
 
 ¶6
 Early one January morning, Rau's girlfriend noticed that
 the door to the basement was open. She told Rau that she
 suspected that an unhoused man had broken into the basement.
 Unhoused individuals apparently frequented the area and had
 previously broken into the building (including the basement),
 sometimes leaving drug paraphernalia and feces behind.
 Because police officers had failed (or had been slow) to
 respond to calls related to such unhoused individuals in the
 past, Rau grabbed a headlamp, armed himself with a loaded
 revolver, and made his way to the basement.
 
 
 ¶7
 Upon arriving at the door to the basement, Rau noticed that
 it was indeed open and that there were pry marks around the
 padlock. As he descended the stairs, Rau turned his headlamp
 on because the basement was dark. He found D.R., a large man
 (six feet, five inches tall), asleep under a sleeping bag in
 a small storage closet. Additionally, Rau observed drug
 paraphernalia in D.R.'s general
 
 7
 
 vicinity. Because, as the old adage goes, a picture is worth
 a thousand words, below are a few pictures depicting the
 front of the house, the door to the basement, and the storage
 closet where Rau found D.R. Asleep.
 
 
 Image
 Omitted
 
 8
 
 ¶8
 Rau nudged D.R. with his foot in an attempt to wake him up.
 As Rau did so, he told D.R. that D.R. wasn't supposed to
 be there and needed to leave immediately. D.R., who at that
 point was only about five feet away from Rau, rose to his
 knees, became aggressive, began yelling unintelligibly, and
 proceeded to throw things around. Rau believed that D.R. had
 used drugs while in the basement and was under their
 influence. As D.R.'s behavior escalated, Rau became
 scared and warned D.R. multiple times that he had a gun. None
 of the warnings altered D.R.'s behavior, however, so Rau
 said he would "count to five" and if D.R.
 hadn't left when he finished counting, he would shoot.
 Rau loudly counted to five. Not only did D.R. refuse to
 leave, his menacing and intimidating behavior continued.
 Fearing that D.R. was going to charge at him, Rau fired his
 gun. D.R. died from the gunshot wound.
 
 9
 
 ¶9
 A grand jury indicted Rau for second degree murder (heat of
 passion).
 
 
 Before
 trial, Rau moved to dismiss the charge, arguing that he was
 immune from prosecution under the force-against-intruders
 statute. Following an evidentiary hearing, the district court
 agreed with Rau, granted his motion, and dismissed the charge
 against him.
 
 
 ¶10
 The People appealed on two grounds. First, they asserted that
 the district court had erred in concluding that the basement
 was part of Rau's "dwelling," one of the
 conditions for immunity under section 18-1-704.5. Second,
 they maintained that Rau had presented insufficient evidence
 to establish two of the other conditions required for
 immunity under section 18-1-704.5: (1) that he reasonably
 believed that D.R. might use physical force against him and
 (2) that he reasonably believed that D.R. had committed or
 intended to commit a crime in the dwelling (in addition to
 the uninvited entry).
 
 
 ¶11
 A division of the court of appeals rejected both of the
 People's claims. Rau, ¶¶ 14, 20, 490
 P.3d at 808. On the dwelling front, the division was unmoved
 by the People's reliance on People v.
 Cushinberry, 855 P.2d 18 (Colo.App. 1992), where a
 different division of the court of appeals determined that
 the common area of an apartment building was not part of a
 dwelling under the force-against-intruders statute.
 Rau, ¶ 18, 490 P.3d at 808. Instead, applying
 the statutory definition of dwelling and our holding in
 Jiminez, the division below concluded that the
 
 10
 
 basement was part of Rau's dwelling. Id. at
 ¶¶ 18-19, 490 P.3d at 808. And, regarding the two
 other conditions mentioned above, the division held that the
 record supported the district court's rulings by a
 preponderance of the evidence. Id. at ¶ 25, 490
 P.3d at 809. More specifically, the division explained that
 the evidence was sufficient to support the court's
 findings that Rau reasonably believed that "D.R. was
 going to use physical force against him" and that Rau
 reasonably believed that "D.R. had committed a crime or
 intended to commit a crime against a person or property in
 the building." Id. at ¶ 26, 490 P.3d at
 809. ¶12 The People then sought certiorari, and we
 granted in part and denied in part their petition. We
 declined to take up the People's sufficiency challenge,
 but we agreed to consider whether the division mistakenly
 held that the basement was part of Rau's dwelling under
 section 18-1-704.5.[4]
 
 
 ¶13
 After setting forth the standard that controls our review and
 the relevant principles of statutory construction that guide
 our decision, we proceed to analyze the question before us.
 Because we agree with the division, we affirm.
 
 11
 
 II.
 Standard of Review and Relevant Principles of Statutory
 Construction
 
 
 ¶14
 Whether the basement was part of Rau's dwelling hinges on
 the meaning of the word "dwelling" in section
 18-1-704.5. Questions of statutory interpretation are
 questions of law that we review de novo. People v.
 Sprinkle, 2021 CO 60, ¶ 12, 489 P.3d 1242, 1245.
 
 
 ¶15
 When we are called upon to interpret a statute, "our
 primary aim is to effectuate the legislature's
 intent." Nieto v. Clark's Market, Inc.,
 2021 CO 48, ¶ 12, 488 P.3d 1140, 1143. To carry out that
 goal, we must first and foremost apply the statute's
 words and phrases "in accordance with their plain and
 ordinary meanings." Bill Barrett Corp. v.
 Lembke, 2020 CO 73, ¶ 14, 474 P.3d 46, 49. If the
 statute's language is unambiguous, we are required to
 apply it as written. Delta Air Lines, Inc. v.
 Scholle, 2021 CO 20, ¶ 13, 484 P.3d 695, 699. We
 may not add words to the statute. Nieto, ¶ 12,
 488 P.3d at 1143. Nor may we subtract words from it.
 Id.
 
 
 ¶16
 We must read statutory words and phrases in context and in
 accordance with the rules of grammar and common usage.
 McCulley v. People, 2020 CO 40, ¶ 10, 463 P.3d
 254, 257. Further, we have to "look to the entire
 statutory scheme in order to give consistent, harmonious, and
 sensible effect to all of its parts." Nieto,
 ¶ 12, 488 P.3d at 1143 (quoting Lembke, ¶
 14, 474 P.3d at 49). And we must avoid interpretations that
 would render any statutory words or phrases
 
 12
 
 "superfluous or lead to illogical or absurd
 results." McCoy v. People, 2019 CO 44, ¶
 38, 442 P.3d 379, 389.
 
 
 ¶17
 If the legislature defines a particular term in a statute,
 "that definition governs." Farmers Ins. Exch.
 v. Bill Boom Inc., 961 P.2d 465, 470 (Colo. 1998). The
 legislature "'has the power to define terms used by
 it,' and it is beyond question that those 'statutory
 definitions control judicial interpretation.'"
 People v. Rigsby, 2020 CO 74, ¶ 24, 471 P.3d
 1068, 1076 (quoting Indus. Comm'n v. Nw. Mut. Life
 Ins. Co., 88 P.2d 560, 563 (Colo. 1939)). Thus, when the
 legislature decides to define a term it uses in a statute,
 that definition, "not an average person's
 understanding" of it, reigns supreme. Id.
 
 
 III.
 Analysis
 
 
 A.
 The Force-Against-Intruders Statute
 
 
 ¶18
 Section 18-1-704.5 acknowledges in subsection (1) that the
 people of this state have the right to expect "absolute
 safety" in their homes. Subsections (2) and (3) then
 follow:
 
 
 (2) [A]ny occupant of a dwelling is justified in using any
 degree of physical force, including deadly physical force,
 against another person when that other person has made an
 unlawful entry into the dwelling, and when the occupant has a
 reasonable belief that such other person has committed a
 crime in the dwelling in addition to the uninvited entry, or
 is committing or intends to commit a crime against a person
 or property in addition to the uninvited entry, and when the
 occupant reasonably believes that such other person might use
 any physical force, no matter how slight, against any
 occupant.
 
 13
 
 (3) Any occupant of a dwelling using physical force,
 including deadly physical force, in accordance with the
 provisions of subsection (2) of this section shall be immune
 from criminal prosecution for the use of such force.
 
 
 ¶19
 The force-against-intruders statute resides in part 7 of
 article 1 of the criminal code (Title 18). Part 7 is labelled
 "Justification and Exemptions from Criminal
 Responsibility" and includes, alongside section
 18-1-704.5, multiple affirmative defense statutes justifying
 the use of physical force: the use of physical force-special
 relationships, see § 18-1-703, C.R.S. (2021);
 the use of physical force in defense of a person,
 see § 18-1-704, C.R.S. (2021); the use of
 physical force in defense of premises, see §
 18-1-705, C.R.S. (2021); and the use of physical force in
 defense of property, see § 18-1-706, C.R.S.
 (2021).
 
 
 ¶20
 Section 18-1-704.5 is similar to section 18-1-704, which is
 known in legal parlance as the self-defense statute. Indeed,
 the two statutes are next-door neighbors. Unlike section
 18-1-704, however, section 18-1-704.5 provides immunity from
 criminal prosecution-it bars criminal proceedings against a
 person who uses force (including deadly physical force) under
 the conditions listed in subsection (2).[5] People v.
 Guenther, 740 P.2d 971, 975 (Colo. 1987). The
 
 14
 
 immunity feature is unique to section 18-1-704.5.
 Id. at 976. Nowhere else in the affirmative defenses
 did the legislature provide immunity from prosecution.
 Id. And, if a pretrial motion to dismiss on grounds
 of immunity under section 18-1-704.5 fails, the defendant
 gets a second bite at the apple: he may raise at trial, as an
 affirmative defense, the conditions set forth in subsection
 (2). Id. at 981. ¶21 A defendant seeking the
 benefit of immunity under the force-against- intruders
 statute bears the burden of establishing, by a preponderance
 of the evidence, the conditions in subsection (2): (1) the
 defendant was an occupant of a dwelling; (2) another person
 made a knowingly unlawful entry into that dwelling; (3) the
 defendant had a reasonable belief that, in addition to the
 uninvited entry, the other person had committed, was
 committing, or intended to commit a crime against a person or
 property in the dwelling; and (4) the defendant reasonably
 believed that the other person might use any physical force
 (no matter how slight) against any occupant of the
 dwelling.[6] Id. at 980-81; COLJI-Crim. H:15
 (2021). Only the first of these conditions is before us
 today. The question we confront is whether Rau was in a
 dwelling when he shot D.R.
 
 15
 
 ¶22
 Section 18-1-901 defines certain terms used in Title 18. One
 of those terms is "dwelling," which is a
 "building . . . used, intended to be used, or usually
 used by a person for habitation."[7] §
 18-1-901(3)(g). Importantly, the General Assembly has
 instructed us to apply this definition "wherever the
 same term is used in the same sense" in Title 18
 "unless the definition is specifically limited or the
 context indicates that it is inapplicable." §
 18-1-901(1). Although we have not had occasion to determine
 what constitutes a "dwelling" in the
 force-against-intruders statute, we are not in uncharted
 waters.[8] Before proceeding, we retrace our
 jurisprudence on the meaning of "dwelling."
 
 
 B.
 Dwelling
 
 
 ¶23
 We applied the statutory definition of "dwelling"
 in Jiminez, albeit before the promulgation of the
 force-against-intruders statute. There, the People charged
 
 16
 
 Jiminez, a juvenile, in district court with burglary of a
 dwelling, a class 3 felony, after he allegedly unlawfully
 entered a house's open garage, took a bicycle, and rode
 off. Jiminez, 651 P.2d at 396. At the end of the
 preliminary hearing, the district court determined that the
 People had failed to establish that the garage was part of a
 dwelling within the meaning of the burglary statute, which
 meant that the charged burglary was a class 4 felony (not a
 class 3 felony) and, correspondingly, that the juvenile court
 had sole jurisdiction over the case. Id. The
 district court thus dismissed the charge with leave to refile
 in juvenile court. Id.
 
 
 ¶24
 The People appealed, and we reversed. Id. at 395.
 Focusing on the definition of dwelling in section
 18-1-901(3)(g), we reasoned:
 
 
 The statutory definition of dwelling comprehends an entire
 building. There is no room in the language of that clearly
 worded statute to exclude from the meaning of dwelling those
 parts of a residence that are not "usually used by a
 person for habitation." Moreover, at least some of the
 usual uses of a residential garage, including storage of
 household items, are incidental to and part of the habitation
 uses of the residence itself.
 
 
 Id. at 396.
 
 
 Hence,
 under section 18-1-901(3)(g), "dwelling"
 encompasses even "those parts of a residence that are
 not usually used by a person directly for habitation,
 including an open garage" People v Young, 825 P.2d 1004,
 1010 (Colo App 1991) (Jones, J, concurring in part and
 dissenting in part) (discussing Jiminez's
 application of the statutory definition of
 "dwelling").
 
 17
 
 C.
 Application
 
 
 ¶25
 In applying the statutory definition of "dwelling,"
 we see no meaningful difference between the garage in
 Jiminez and the basement in this case. Each was part
 of a building that was "used, intended to be used, or
 usually used by a person for habitation." §
 18-1-901(3)(g); Jiminez, 651 P.2d at 396. Just as
 the garage in Jiminez was part of the building that
 was used for habitation, the basement here was part of the
 building that Rau used for habitation. Additionally, just as
 some of the usual uses of the garage in Jiminez
 (including the storage of household items) were incidental to
 and part of the habitation uses of the residence itself, some
 of the usual uses of the basement in this case (including the
 control of the water and heat supply and the storage of
 household items) were likewise incidental to and part of the
 use of Rau's residence. As such, much like the garage in
 Jiminez was part of a dwelling, Rau's basement
 was part of a dwelling.
 
 
 ¶26
 The People argue that the definition of "dwelling"
 in section 18-1-901(3)(g) is inapposite. The context in which
 the term appears in section 18-1-704.5(2), contend the
 People, indicates that the definition is inapplicable to any
 common areas of apartment buildings. But we see nothing in
 the context in which "dwelling" is used in section
 18-1-704.5(2) to convince us that the definition has no
 application here.
 
 18
 
 ¶27
 We are not persuaded otherwise by the decision in
 Cushinberry. In that case, the defendant shot and
 killed the victim in a stairwell landing of an apartment
 building. Cushinberry, 855 P.2d at 19. In a brief
 opinion lacking detailed analysis, a division of the court of
 appeals concluded that the defendant was not entitled to an
 affirmative defense instruction pursuant to section
 18-1-704.5 because the stairwell "was not part of the
 defendant's apartment" and was instead "a
 common area used by other tenants and their guests."
 Id. But the division didn't explain why the
 common areas of the apartment building did not come within
 the definition of "dwelling" in section
 18-1-901(3)(g). Id. Rather, the division summarily
 determined that the statutory definition didn't include
 common areas of apartment buildings. Id. Notably,
 the division didn't cite, let alone discuss, our decision
 in Jiminez. Regardless, we're not bound by
 Cushinberry and, to the extent it is inconsistent
 with this opinion, it is now overruled.
 
 
 ¶28
 The People latch onto the fact that the legislature
 hasn't amended the definition of "dwelling" in
 section 18-1-901(3)(g) since Cushinberry was
 announced. According to the People, this must mean that the
 legislature agrees with the analysis in Cushinberry.
 The People read too much into legislative silence. As
 we've observed before, "of the many sources we may
 consult to discern legislative intent, reliance on
 legislative inaction is particularly risky" because the
 reasons for not enacting legislation "are too numerous
 to tally." Welby Gardens v. Adams Cnty. Bd. of
 Equalization,
 
 19
 
 71 P.3d 992, 998 n.8 (Colo. 2003) (quoted with approval in
 People v. Jones, 2020 CO 45, ¶ 63, 464 P.3d
 735, 747, where we declined the People's invitation to
 infer legislative intent from the fact that the legislature
 had not amended the definition of "child" or
 "person" in the child abuse statute following a
 particular court of appeals decision, despite having amended
 the statute several times during that timeframe). Inasmuch as
 our court has never interpreted the term "dwelling"
 in the force-against-intruders statute, we do not find such
 legislative inaction instructive. See Jones, ¶
 65, 464 P.3d at 747. Drawing inferences from legislative
 silence in the circumstances before us is fraught with peril
 because it invites us to speculate.
 
 
 ¶29
 The People nevertheless insist that two of the trespass
 statutes reflect the legislature's intent to exclude the
 common areas of apartment buildings from the definition of
 "dwelling." In our view, however, these statutes
 offer no lifeline to the People.
 
 
 ¶30
 Under section 18-4-502, C.R.S. (2021), a person commits first
 degree criminal trespass, a class 5 felony, "if such
 person knowingly and unlawfully enters or remains in a
 dwelling of another." (Emphasis added.) But under
 section 18-4-503(1)(b), C.R.S. (2021), a person commits
 second degree criminal trespass, a class 3 misdemeanor, if
 such person "[k]nowingly and unlawfully enters or
 remains in or upon the common areas of a hotel, motel,
 condominium, or apartment building."
 
 20
 
 (Emphasis added.) The People posit that the legislature's
 distinction in these two statutes between a dwelling and the
 common areas of apartment buildings demonstrates its intent
 to exclude the common areas of apartment buildings from the
 definition of "dwelling."
 
 
 ¶31
 The People are right-but only in the context of the quoted
 criminal trespass statutes. "Dwelling" in the
 first degree criminal trespass statute doesn't
 include the common areas of hotels, motels, condominiums, or
 apartment buildings. If someone trespasses any such common
 area, then the second degree criminal trespass
 statute, not the first degree criminal trespass
 statute, applies. Still, the criminal trespass statutes under
 inspection in no way support the People's position here.
 To the contrary, they directly undercut it. The criminal
 trespass statutes the People dangle as grounds for reversal
 showcase precisely the type of "context" that
 renders the definition of dwelling in section 18-1-901(3)(g)
 inapplicable. See § 18-1-901(1) (stating that
 each definition set forth there, including for
 "dwelling," applies throughout Title 18
 "unless . . . the context indicates that it is
 inapplicable"). Such context is nowhere to be found in
 section 18-1-704.5. Had the legislature intended to exclude
 the common areas of apartment buildings from the term
 "dwelling" in section 18-1-704.5, it presumably
 would have followed the blueprint of the two criminal
 trespass statutes discussed.
 
 21
 
 ¶32
 Finally, the People maintain that affirming the
 division's judgment will lead to absurd results because
 the immunity afforded by section 18-1-704.5 "would
 extend to every nook and cranny" in apartment buildings,
 including all the common areas over which tenants and their
 guests have shared control, such as elevators, parking
 garages, clubhouses, and laundry and mail rooms. And, add the
 People, such immunity could presumably also extend to spaces
 over which tenants are meant to have no control, including
 those limited to landlords and their staff (e.g., storage
 rooms and business offices), unoccupied apartments, and even
 apartments occupied by other tenants.
 
 
 ¶33
 We recognize that shared living arrangements introduce an
 interesting dynamic into the dwelling inquiry. Indeed, if the
 home in question had not been divided into separate units and
 Rau and his girlfriend had been its sole occupants, we doubt
 that anyone would have disputed that the basement was part of
 his dwelling.[9]
 
 
 ¶34
 In 1985, when section 18-1-704.5 came into being, the
 legislature may not have foreseen the types of shared living
 arrangements that have become
 
 22
 
 conventional in 2022. To be sure, times have changed. But we
 have no authority to redraft section 18-1-704.5 in an attempt
 to contemporize it. It is for the legislature, not our court,
 to rewrite a statute. See Blount v. Rizzi, 400 U.S.
 410, 419 (1971). Even if we were authorized to revise
 statutory provisions, our court is ill-equipped to make the
 types of policy decisions implicated in redefining
 "dwelling" for purposes of section 18-1-704.5. For
 example, we discussed with counsel during oral argument the
 possible wisdom of considering any common area of an
 apartment building (and of any shared living arrangement) to
 be part of a dwelling only when the general public is
 excluded from it and the occupant in question uses it
 (directly or indirectly) for habitation. But would that avert
 all possible absurd results? Would it properly cover all
 shared living arrangements? And would it have any unintended
 consequences for people in certain types of shared living
 arrangements?
 
 
 ¶35
 Rather than play legislators, we exercise restraint and limit
 our decision to the narrow situation in this case. To the
 extent that the definition of "dwelling" in section
 18-1-901(3)(g) is outdated or otherwise problematic when
 applied in the context of section 18-1-704.5, legislative
 repair-not judicial gloss-is required.
 
 23
 
 ¶36
 Thus, today we simply conclude that, under section
 18-1-704.5, the basement in the house where Rau and his
 girlfriend rented an apartment was part of his dwelling when
 he shot D.R. We decide nothing more and nothing
 less.[10]
 
 
 IV.
 Conclusion
 
 
 ¶37
 For the foregoing reasons, we affirm the division's
 judgment. Rau was in his dwelling when he shot D.R.
 
 24
 
 ---------
 
 
 Notes:
 
 
 [1] The statute is not unique to Colorado.
 See Wilbanks, supra, at 26-27. Many
 jurisdictions have similar statutes. Jay M. Zitter,
 Annotation, Construction and Application of "Make My
 Day" and "Stand Your Ground" Statutes, 76
 A.L.R. 6th 1 (2012). And Colorado wasn't the first state
 to adopt such a statute-in fact, California had enacted a
 more permissive version of it ("Home Protection Bill of
 Rights") the previous year (in 1984). See
 Wilbanks, supra, at 30.
 
 
 [2] While the home had been chopped into
 multiple residential units, it retained some of the vestiges
 of a single-family home.
 
 
 [3] The landlord often relied on Rau and
 another tenant to check on problems related to the water and
 heat supply. In exchange, Rau and the other tenant received
 discounted rent.
 
 
 [4] The specific question on which we
 granted certiorari is:
 
 
 Whether the court of appeals erred by declining to
 follow the decision in People v. Cushinberry, 855
 P.2d 18 (Colo.App. 1992), and holding that the basement in
 question was a "dwelling" for purposes of the
 "make-my-day" statute, section 18-1-704.5, C.R.S.
 (2020).
 
 
 [5] Section 18-1-704.5(4) also provides
 immunity from "civil liability for injuries or
 death" for the use of force (including deadly physical
 force) under the conditions listed in subsection (2).
 
 
 [6] Although the force-against-intruders
 statute doesn't contain a mens rea, "the
 'knowingly' mens rea is required to carry out the
 principles of self-defense." McNeese, 892 P.2d
 at 309. After all, the statute "is not a license to
 commit homicide." Id.
 
 
 [7] "Building," as used in the
 statutory definition of "dwelling," refers to
 "a structure which has the capacity to contain, and is
 designed for the shelter of, man, animals, or property, and
 includes a . . . place adapted for overnight accommodations
 of persons or animals, or for carrying on of business
 therein, whether or not a person or animal is actually
 present." § 18-4-101(1), C.R.S. (2021);
 Armintrout v. People, 864 P.2d 576, 581 n.7 (Colo.
 1993).
 
 
 [8] Consistent with the mandate in section
 18-1-901(1), the court of appeals has always turned to the
 definition in section 18-1-901(3)(g) when construing
 "dwelling" in section 18-1-704.5. See Rau,
 ¶ 15, 490 P.3d at 808; Alaniz, ¶ 24, 409
 P.3d at 513.
 
 
 [9] This opinion should not be understood
 as establishing that all common areas in shared living
 arrangements come within the scope of the term
 "dwelling" in the force-against-intruders statute.
 The question before us is much narrower and, accordingly, so
 is our holding.
 
 
 [10] We pass no judgment on the district
 court's determination that Rau demonstrated by a
 preponderance of the evidence that he reasonably believed
 both that D.R. might use physical force against him and that
 D.R. had committed or intended to commit a crime in the
 dwelling (in addition to the uninvited entry).
 
 
 ---------