22CA1917 Peo v Owens 04-03-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA1917
Arapahoe County District Court No. 05CR2945
Honorable Christopher J. Munch, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Sir Mario Owens,

Defendant-Appellant.

ORDER AFFIRMED

Division II
Opinion by JUDGE FOX
Gomez and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 3, 2025

Philip J. Weiser, Attorney General, Katharine Gillespie, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Jonathan D. Reppucci, Alternate Defense Counsel, Denver, Colorado, for
Defendant-Appellant

¶ 1    Defendant, Sir Mario Owens, appeals the order denying his 2017 motion for postconviction relief as successive under Crim. P. 35(c)(3)(VII).  We affirm.

## I.    Background

### A.    The Underlying Trial

¶ 2    In 2007, Owens was convicted of various crimes including the first degree murder of Gregory Vann and the attempted murders of Javad Marshall-Fields and Elvin Bell in connection with a 2004 shooting at Lowry Park in Aurora.  After two witnesses to the Lowry Park shooting were killed in 2005 on Dayton Street in Aurora, Owens was separately tried and convicted of those murders.  *See People v. Owens*, 2024 CO 10, ¶¶ 5, 17, 62 (*Owens III*).  A division of this court affirmed Owens' convictions for the Lowry Park shooting.[1]  *People v. Owens*, (Colo. App. No. 07CA0895, July 26, 2012) (not published pursuant to C.A.R. 35(f)) (*Owens I*).  Divisions of this court and our supreme court have heard several appeals

---

[1] This appeal concerns only the Lowry Park trial and related postconviction proceedings.  We discuss the Dayton Street trial solely for context and because the postconviction court in the Lowry Park proceedings reviewed evidence from the Dayton Street postconviction proceedings.

related to both trials, and a further recitation of the underlying facts may be found in those opinions. *E.g.*, *id.*; *Owens III*, ¶¶ 5-62; *People v. Owens*, slip op. at ¶¶ 1-13 (Colo. App. No. 17CA1182, Oct. 7, 2021) (not published pursuant to C.A.R. 35(e)) (*Owens II*).

## B.   The 2014 Postconviction Motion

¶ 3    In 2014, Owens filed a Crim. P. 35(c) motion for postconviction relief, alleging, as relevant here, that a juror in the Lowry Park trial, Juror 75, engaged in misconduct by "failing to disclose critical information during jury selection," among other things.

¶ 4    The events leading to this claim began mid-trial in 2007. The district court notified the parties that a juror had informed the bailiff that "she recognized an individual who came into the courtroom," the district court asked the bailiff "to inquire as to who that person is," and the court (via the bailiff) confirmed that the person, Melissa White, was not a witness and was only observing the trial. Later, the prosecution revisited the issue, noting that White was sitting with Owens' mother, so "it might be wise to inquire if [Juror 75] does know Mr. Owens['] family . . . [and] the nature of [Juror 75's] relationship with Ms. White."

¶ 5     When asked if the defense wanted to further inquire, counsel said, "I'm not requesting that, but . . . I don't have any objection to it." The district court then denied the prosecution's request for additional inquiry, citing concerns about chilling the right to observe court proceedings "just based upon where an individual is sitting in the courtroom and who they may be seated next to."

¶ 6     Juror 75's relationship to the case was not revisited until after trial. However, postconviction proceedings revealed that Juror 75's connections were more extensive than the parties initially believed. As relevant here, Owens believed Juror 75 told the bailiff she knew more people than just White, and in his postconviction motion, he asserted that "at least based on what [Juror 75] has stated, the judge who presided over the Lowry Park trial . . . was aware of the fact that [Juror 75] was working under the influence of extraneous information, but he did not disclose this information to the parties."

¶ 7     As discussed below, Juror 75 gave conflicting testimony and statements about whether she told the bailiff she knew other witnesses and/or people in addition to White. But in various postconviction pleadings, Owens repeatedly asserted that the district court knew more about Juror 75's familiarity with the case

than it disclosed at trial. Owens also suggested that the district court's failure to disclose Juror 75's communications with the court and/or the bailiff may have constituted judicial misconduct. Despite repeatedly suggesting that the district court may have erred by withholding information about Juror 75 from the parties, Owens did not raise such a claim in the first postconviction proceedings.

¶ 8 In May 2017, the postconviction court denied Owens' Crim. P. 35(c) motion, concluding, as relevant here, that he failed to prove that Juror 75 committed juror misconduct or that her presence on the jury prejudiced him. The postconviction court found that "Juror 75 realized that she recognized [the] faces of some people in the courtroom," including "at least three and probably four witnesses and possibly other people in the gallery," beyond White. However, in part because Juror 75 did not have a relationship with these witnesses, the postconviction court concluded that Owens was not denied "a fair trial due to Juror 75's recognition of witnesses and courtroom observers."

¶ 9 As for Juror 75's conversation with the bailiff, the postconviction court found that

> Juror 75 told the bailiff that she knew people in the courtroom. The bailiff then reported to the judge, who told the bailiff to get a name. When asked for a name, Juror 75 specifically mentioned Melissa White — the only person whom she knew by name. The bailiff reported back to the judge. When contacted years later, the bailiff could not recall what Juror 75 told her or what she told the judge.
>
> When she testified in 2015, Juror 75 was sure that she told the bailiff that she recognized several people — plural. When she testified again in 2016 she only remembered telling the bailiff about White. The 2015 version was more detailed and appears to be more accurate. Her intention was to explain the entire situation to the judge, but she was never given the opportunity and was told that she would remain on the jury.

¶ 10    Thus, the postconviction court concluded that the district court "may have erroneously inferred from the bailiff's reports that Juror 75 recognized only one person — White." It also noted that Juror 75 was denied an opportunity to speak with the district court after attempting to bring the issue to its attention and that "it would certainly have been preferable if the trial court had spoken to Juror 75 as she, and later the prosecution, requested." Therefore, although it found that the "court's decision not to interview the juror deprived the court and parties of information that would have

been useful in deciding whether to replace [her]," the postconviction court noted that "[t]he issue . . . [was] whether [J]uror 75's service deprived Owens of his constitutional right[s] . . . not whether the trial court should have" granted the requests to interview her.

C.     The 2017 Appeal and Second Postconviction Motion

¶ 11     In July 2017, Owens appealed the first postconviction court's order denying his 2014 Crim. P. 35(c) motion.  In December 2017, while the appeal was pending, he filed a second Crim. P. 35(c) motion.  In his appeal and his 2017 postconviction motion, Owens alleged that the first postconviction court's findings gave rise to new claims.  On appeal, he argued that the first postconviction court found that Juror 75 had ex parte communications with the district court and those communications "denied Owens' rights to counsel and to be present" and violated his due process rights.  In the second postconviction motion, he similarly alleged that the first postconviction court found that "substantive, *ex parte* communications occurred . . . wherein Juror 75 actually advised the court that she knew several people in the courtroom"; the court withheld the communications from the parties; and this violated Owens' rights to counsel, to be present, and to due process.

¶ 12    In 2021, a division of this court affirmed the first postconviction court's order denying relief under Crim. P. 35(c). *Owens II*, slip op. at ¶ 168.  The division held that "Juror 75's jury service did not deprive Owens of a fair trial." *Id.* at ¶ 154.  It also disagreed with Owens' claim that the postconviction court "found that there were undisclosed ex parte communications, and [it] decline[d] to make that factual finding on appeal." *Id.* at ¶ 143 n.29; *see also People v. A.W.*, 982 P.2d 842, 852 (Colo. 1999) ("Appellate courts are not empowered to make factual findings, absent such findings in the record below.").  The division also concluded that "Owens was not denied due process or fundamental fairness" because the district court's communications were "sufficient to alert the parties that further inquiry was necessary," and "Owens did not request the opportunity to question Juror 75." *Owens II*, slip op. at ¶ 143 n.29.

¶ 13    In 2022, the second postconviction court summarily denied Owens' 2017 postconviction motion as successive under Crim. P. 35(c)(3)(VII).  It held that all the evidence alleged in the 2017 postconviction motion "came to light well before [that] motion was filed, well before this Court's May 16, 2017, order denying the prior

7

[Crim. P.] 35(c) petition, and before the last amendment to that . . . petition." It also rejected Owens' argument that the first postconviction court's findings gave rise to new claims because the "findings and order on the prior [Crim. P.] 35(c) petition do not constitute a legitimate basis for a new [Crim. P.] 35(c) petition. The remedy for any error in the ruling on the earlier petition would be review on appeal."[2] This appeal followed.

## II.    Issues Raised on Appeal

¶ 14    On appeal, Owens argues that his second postconviction motion was not successive. Therefore, he asks us to reach the merits of his claim raised in the motion that the district court erred by "fail[ing] to relay to the parties that Juror 75 disclosed she knew multiple people in the courtroom," which he contends violated his rights (1) to counsel at a critical stage; (2) to be present at a critical stage; and (3) to due process. Because we conclude that the second postconviction court did not err by denying Owens' second postconviction motion as successive, we do not address the merits.

---

[2] The postconviction court's 2022 order did not discuss *Owens II*.

### III. The 2017 Postconviction Motion was Successive

#### A. Standard of Review

¶ 15    "We review de novo a trial court's decision to deny a postconviction motion as successive." *People v. Bonan*, 2014 COA 156, ¶ 26 (citing *People v. Muniz*, 667 P.2d 1377, 1380-81 (Colo. 1983)).

#### B. Relevant Law and Analysis

¶ 16    Under Crim. P. 35(c)(3)(VI) and (VII), subject to certain exceptions, "court[s] shall deny any claim[s]" (1) that were "*raised and resolved* in a prior appeal or postconviction proceeding"; or (2) "that *could have been presented* " in a previous appeal or postconviction proceeding.  (Emphasis added.)  Under both subsections, an exception applies to "claim[s] based on evidence that could not have been discovered previously through the exercise of due diligence."  Crim. P. 35(c)(3)(VI)(a), (VII)(b).  Under Crim. P. 35(c)(3)(VII)(a) and (e), claims that could have been brought are also not barred if they are "based on events that occurred after initiation of the defendant's prior appeal or postconviction proceeding" or if "an objective factor, external to the defense and not attributable to the defendant, made raising the claim[s] impracticable."

9

¶ 17    Owens argues that his second postconviction motion was not successive because the facts supporting his claims "came to light only through the postconviction court's findings." He contends that his second postconviction motion satisfied the exceptions in Crim. P. 35(c)(3)(VII)(a), (b), and (e) because the first postconviction court's findings were new evidence, a new event, and "an objective factor . . . [that] made raising the claims impracticable." We conclude that these arguments rest on a fundamental misunderstanding.

¶ 18    First, with respect to Owens' argument that his "claims are based on the facts as found by the postconviction court — facts that could not have been reasonably discovered or presented previously," Owens appears to misunderstand the difference between evidence and a court's findings of fact. *See* Crim. P. 35(c)(3)(VII)(b).

¶ 19    According to Black's Law Dictionary, evidence is "[s]omething (including testimony, documents, and tangible objects) that tends to prove or disprove the existence of an alleged fact; anything . . . offered to prove the existence or nonexistence of a fact"; or "[t]he collective mass of things, esp. testimony and exhibits, *presented before a tribunal* in a given dispute." Black's Law Dictionary 696

(12th ed. 2024) (emphasis added). A finding of fact, or a finding, is "[a] determination by a judge . . . of a fact *supported by the evidence in the record* . . . ; a conclusion or ruling that an alleged fact more probably exists than not." *Id.* at 772 (emphasis added).

¶ 20    A Texas court aptly illustrated this distinction: "[A] finding of fact is not evidence proving the fact supposedly found to exist. This is so because a finding of fact is little more than a characterization or construction of the evidence by the fact-finder. And, before a finding can be valid, it must enjoy evidentiary support." *Vidaurri v. Ensey*, 58 S.W.3d 142, 146 (Tex. App. 2001). Thus, a fact finder cannot conclude that an object is a car without "evidence from which it can be deduced that the object is a car. That the fact-finder concludes that it is a car, is not proof that it is a car." *Id.* Other courts have reached similar conclusions. *See In re B.R.W.*, 2021-NCCOA-343, ¶ 40 ("[A] trial court's findings of fact are not evidence . . . ."); *Tex. Real Est. Comm'n v. Nagle*, 767 S.W.2d 691, 695 (Tex. 1989) ("[F]indings of fact and conclusions of law . . . are not evidence.").

¶ 21    A division of this court applied similar reasoning to conclude that new academic theories do not constitute new evidence under

11

Crim. P. 35(c). *Bonan*, ¶¶ 30-31 ("Academic theories merely form the basis for interpreting evidence when they are applied to existing evidence."). Just as a fact finder uses academic theories to interpret existing evidence, a court uses its interpretation of existing evidence as the basis for its factual findings. The findings themselves are not evidence. Therefore, we reject Owens' argument that the first postconviction court's findings were "evidence that could not have been discovered previously" under Crim. P. 35(c)(3)(VII)(b).

¶ 22 For similar reasons, we also conclude that Owens' second postconviction motion was successive because he could have brought the same claims in an earlier proceeding. *See* Crim. P. 35(c)(3)(VII).

¶ 23 Owens first emphasizes that, because the evidence in the first postconviction proceedings suggested that Juror 75 only disclosed knowing or recognizing White, "[t]he postconviction court's finding that Juror 75 disclosed her recognition and/or knowledge of multiple people in the courtroom presented entirely new information" that could not have been previously discovered. Thus, he argues that the second postconviction court clearly erred when it

concluded that "[a]ll of the evidence . . . came to light well before" the second postconviction motion. We reject this contention of error and agree with the second postconviction court that Owens had access to the evidence supporting the first postconviction court's findings before that postconviction court ruled on the first postconviction motion and before Owens filed his second postconviction motion.

¶ 24 Owens also places great weight on the conflicting evidence as to whether Juror 75 told the bailiff and/or the district court that she recognized or knew multiple people. But *conflicting* evidence differs from *new* evidence. During the first postconviction proceedings, Owens repeatedly suggested that the district court knew but did not disclose that Juror 75 recognized multiple individuals. Moreover, Juror 75 said in 2013 and in 2015 that she told the bailiff she recognized more than one person. A timeline of the most pertinent evidence from the postconviction proceedings and statements in Owens' pleadings follows.

¶ 25 2008: Another juror in the Lowry Park trial, Juror B.K., told a defense investigator that, "after the verdict one of the jurors shared that she knew" about the people involved in the case, and the juror

(presumably Juror 75) said "she had privately met with the judge to share her concerns but that she was told not to discuss this with the other jurors until after the trial."

¶ 26   2013: Juror 75 told a prosecution investigator that "she had informed the judge early on in the process that *she knew some people*" but later clarified that she never spoke directly with the judge.  (Emphasis added.)  However, Juror 75 told a defense investigator that "she informed the bailiff that she knew Melissa White . . . [but] she did not tell the bailiff that she knew some of the witnesses who testified."

¶ 27   2014: Owens alleged in his first Crim. P. 35(c) motion that Juror 75's statements suggested that the district court knew Juror 75 "was working under the influence of extraneous information, but [it] did not disclose this information to the parties."

¶ 28   2014: In a motion to disqualify Judge Spear — who presided over the Lowry Park trial — from the postconviction proceedings, Owens quoted an argument from his 2012 Dayton Street postconviction motion that "the information supplied to date indicates Judge Spear was contacted" about Juror 75's familiarity with the case but "failed to provide notice of potential juror

14

misconduct to the parties," and while "such a claim [is] difficult to comprehend . . . this claim is now presented. If true, *Judge Spear's failure to provide such information to trial counsel prejudiced Owens.*" (Emphasis added.) He also stated that Juror 75 "will testify . . . that she provided misleading and untrue information . . . that she was not an impartial juror, and that Judge Spear was told of these facts during trial but took no action."

¶ 29    2015: Referencing her conversation with the bailiff, Juror 75 first testified that she "didn't say anything about witnesses. [She] just said [she] knew Melissa White's name and [she] knew other faces that were out there, not that they were a witness [sic]." On cross-examination, the prosecution asked: "[A]s I recall what you have said was that you told [the bailiff] that you knew some people plural," and Juror 75 said, "That's right." She then clarified that she "only knew Melissa White's name," but when asked if her "recollection [was] that [she] did let [the bailiff] know that [she] knew more than one person or at least thought [she] recognized more than one person," Juror 75 again said, "That's right."

¶ 30    2015: In a renewed motion to disqualify Judge Spear, citing Juror 75's testimony, Owens stated, "[A]ccording to [Juror 75], she

15

informed Judge Spear, through the bailiff, that she recognized witnesses in the case, and that through the bailiff, Judge Spear said that was okay . . . ."

¶ 31    2016: Juror 75 testified that her "best memory" was that "when [she] spoke to the bailiff, it was about Melissa, not about . . . anyone else."

¶ 32    2016: In another motion to disqualify Judge Spear, Owens asserted that if the fact finder believed that "Juror [75] . . . informed [the district court] of her familiarity with *several witnesses, . . .* then a claim of *judicial misconduct* would exist." (Emphasis added.)

¶ 33    2017: Owens argued in a pleading that Juror B.K.'s 2008 interview "raised the unmistakable specter of *judicial misconduct*" by suggesting undisclosed communications between Juror 75 and the district court. (Emphasis added.)

¶ 34    This evidence presumably formed the basis for the first postconviction court's conclusion that Juror 75 told the bailiff she recognized multiple people. And Owens' pleadings suggest that he knew that evidence could support a claim that the district court erred. When it issued its 2017 order, the first postconviction court had access to the same information that Owens did when he

16

repeatedly alluded to undisclosed ex parte communications. The fact that the first postconviction court found Juror 75's 2015 testimony more credible than other evidence did not create *new* evidence previously unavailable to Owens.

¶ 35 That the evidence was conflicting or inconsistent also does not mean, as Owens suggests, that he lacked a basis to argue that the district court failed to disclose the full extent of Juror 75's communications with the bailiff. He relies on C.R.C.P. 11, which is a rule of *civil* procedure, but even under the Colorado Rules of Professional Conduct, a claim is not frivolous merely because "the facts have not [yet] been fully substantiated." *People v. Layton*, 494 P.3d 693, 725 (Colo. O.P.D.J. 2021) (citing Colo. RPC 3.1). And while Owens emphasizes the discrepancies in Juror 75's statements, "defense counsel . . . should not be placed in the position of warranting the validity of [another's] assertions" and "may properly 'present a supportable argument which is extremely unlikely to prevail . . . .'" *People v. Breaman*, 924 P.2d 1139, 1141 (Colo. App. 1996) (alteration in original) (quoting *Mission Denver Co. v. Pierson*, 674 P.2d 363, 365 (Colo. 1984)), *aff'd*, 939 P.2d 1348 (Colo. 1997).

¶ 36    In sum, the first postconviction court's findings did not create new evidence, and Owens could have alleged in the first postconviction proceedings that the district court — via the bailiff — engaged in undisclosed, allegedly ex parte communications with Juror 75. *See* Crim. P. 35(c)(3)(VII)(b).  Witness credibility and the resolution of conflicting testimony were for the fact finder to determine and did not bear on whether Owens could raise a claim. *See People v. Rau*, 2020 COA 92, ¶ 22, *aff'd*, 2022 CO 3.

¶ 37    Finally, Owens posits that his second postconviction motion was not barred because the first postconviction court's factual findings were (1) an "event[] that occurred after initiation of [his] prior appeal or postconviction proceeding"; and (2) an "objective factor, external to the defense and not attributable to [Owens], [that] made raising the claim impracticable."  Crim. P. 35(c)(3)(VII)(a), (e).  Inexplicably, he argues that those findings were

an event "because they were against the weight of the evidence."[3]

He also contends that the "objective factor" was the district court's "nondisclosure of crucial information from a juror," which presumably encompasses an argument that the first postconviction court's findings proved such nondisclosure.

¶ 38    We do not see how these arguments differ from his contention that the postconviction court's findings constituted new evidence. For the same reasons that we conclude a court's findings are not evidence, we conclude that such findings do not amount to qualifying "events" or "objective factor[s]" under Crim. P. 35(c)(3)(VII)(a) and (e).  For example, if a court's finding were a qualifying event or objective factor, so too would be a newly published academic theory.  *See Bonan*, ¶ 31.  Moreover, that

---

[3] In his opening brief, Owens similarly notes that, despite evidence that Juror 75 told the bailiff she only knew or recognized one person, "the postconviction court *somehow found* that [she] . . . advised the bailiff that she knew several people."  (Emphasis added.)  But an argument that these findings lack record support would suggest clear error or an abuse of discretion — not newly discovered evidence or a new event.  *See People v. Beauvais*, 2017 CO 34, ¶ 22 (appellate courts set aside factual findings that are "so clearly erroneous as to find no support in the record"); *Robertson v. People*, 2017 COA 143M, ¶ 9 ("A district court abuses its discretion if its findings . . . are 'so manifestly against the weight of evidence in the record as to compel a contrary result' . . . .") (citation omitted).

Owens' claims were not based on new evidence and could have been raised in the first postconviction proceedings precludes a conclusion that objective factors made raising them impracticable. *See* Crim. P. 35(c)(3)(VII)(e).

¶ 39     Thus, we conclude that the exceptions to successive postconviction motions in Crim. P. 35(c)(3)(VII)(a), (b), and (e) do not apply, and the postconviction court properly dismissed Owens' second postconviction motion as successive.[4]  The People also posit that (1) Owens' second postconviction motion was successive under Crim. P. 35(c)(3)(VI) because the claims had been "raised and resolved" in *Owens II*, and (2) the law of the case doctrine precludes finding for Owens on the merits.  Because we conclude that the motion was successive under Crim. P. 35(c)(3)(VII), we need not address either argument.

## IV.   Disposition

¶ 40     The order denying Owens' 2017 Crim. P. 35(c) motion as successive is affirmed.

JUDGE GOMEZ and JUDGE LUM concur.

---

[4] Having concluded that the motion is successive, we need not address Owens' argument that it was timely.

20