The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader. The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
November 9, 2023

**2023COA104**

**No. 20CA1568, *People v. Jones* — No. 20CA1568, People v.
Jones — Criminal Law — Affirmative Defenses — Mistake of
Fact — Self-Defense — Use of Physical Force in Defense of a
Person — Use of Deadly Physical Force Against an Intruder**

Applying the division's analysis in *People v. Toler*, 981 P.2d

1096, 1099 (Colo. App. 1998), *aff'd*, 9 P.3d 341 (Colo. 2000), a

division of the court of appeals holds that the trial court here

properly refused to give a self-defense instruction under

subsections (2)(b) and (2)(c) of the self-defense statute. § 18-1-704,

C.R.S. 2023. The trial court properly recognized that giving such

an instruction would be based only on the actual belief of the

defendant. And the self-defense statute takes into account both the

reasonable belief and the actual belief of the defendant. *Toler*, 981

P.2d at 1099.

COLORADO COURT OF APPEALS **2023COA104**

Court of Appeals No. 20CA1568
Delta County District Court No. 18CR92
Honorable Steven L. Shultz, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Heather Palmer Jones,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE FURMAN
Fox and Pawar, JJ., concur

Announced November 9, 2023

Philip J. Weiser, Attorney General, Frank R. Lawson, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, John Plimpton, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Applying the division's analysis in *People v. Toler*, 981 P.2d 1096, 1099 (Colo. App. 1998), *aff'd*, 9 P.3d 341 (Colo. 2000), we hold that the trial court here properly refused to give a self-defense instruction under subsections (2)(b) and (2)(c) of the self-defense statute.  § 18-1-704, C.R.S. 2023.  The trial court properly recognized that giving such an instruction would be based only on the actual belief of the defendant.  And the self-defense statute takes into account both the reasonable belief and the actual belief of the defendant.  *Toler*, 981 P.2d at 1099.

¶ 2     Defendant, Heather Palmer Jones, shot the victim — her friend — while staying at the victim's home in early 2018.  The victim died from complications caused by the gunshot wound eight months later.

¶ 3     Jones asserted the defense of self-defense based on her mistaken belief that the victim was an intruder.  *See* § 18-1-704(2)(a); § 18-1-504(1)(a), (c), C.R.S. 2023.

¶ 4     The jury wasn't persuaded by Jones's defense and found her guilty of second degree murder.  The trial court sentenced her to twenty-four years in prison.

¶ 5     Jones appeals.  She contends that (1) the trial court erred by declining to instruct the jury on the affirmative defense of force against intruders and the affirmative defense of self-defense under subsections (2)(b) and (2)(c) of the self-defense statute; (2) the trial court violated her rights under the Confrontation Clause of the United States Constitution by admitting testimonial statements of the victim that the defense's expert witness considered; and (3) the prosecution committed misconduct during voir dire.  We affirm the judgment of conviction.

## I.     The Shooting

### A.     Events Leading up to the Shooting

¶ 6     Throughout 2017, Jones reconnected with a friend, Lynette Taylor, who told Jones that she had been living with a man who was abusive toward her and was part of an extremely dangerous motorcycle gang that trafficked drugs.  Jones first met this man when Taylor brought him to Jones's home in May 2017, and Taylor told Jones she was afraid of the man.

¶ 7     Taylor, together with the man, visited Jones's home again in September 2017.  Jones testified that she "wasn't afraid of this guy" and "was honestly a little curious to meet him" despite the things

Taylor told her. During this visit, the man left his trailer at Jones's home and removed it about a week later.

¶ 8　In December, Taylor came to Jones asking for a place to stay. Taylor stayed at Jones's home on and off throughout December and early January. At one point, Taylor returned to Jones's home with "bruises from a man she was working for and in some ways seeing" who had sexually assaulted her.

¶ 9　On January 11, 2018, a day before the shooting, Jones took Taylor to a meeting with Taylor's probation officer, which ended with Taylor being taken into custody. Throughout that day, Jones received five voicemails from a phone number that Taylor had used to call her. The voicemails were left by a man who addressed Jones by name (though Jones had never met the man). This man said he was looking for Taylor. In response to these voicemails, Jones was "afraid at that point" and "stopped by [the victim's] house." There was no evidence that the victim knew Taylor, or any of the men Taylor associated with. That night, Jones stayed at a different friend's house.

## B. The Day of the Shooting

¶ 10 The next day, Jones returned to her home in the early afternoon accompanied by the victim. Upon arriving home, Jones and the victim observed "damage to [Jones's] property" and "mud splattered on [Taylor's] car" resulting from "donuts in the mud" and "tire tracks [having] driven over one of the skids on [her] snowmobile." They also observed "boot prints that led up to [Jones's] house," where they noticed "damage to the area of the dead bolt where a key is inserted" that "look[ed] like something was forced into that area and caused damage on both sides of the keyhole." Jones was "terrified," so she left to stay at the victim's house.

¶ 11 Jones stored several of her guns in the victim's gun cabinet. While at the victim's house, she retrieved her 9 mm gun, ammunition, and two clips and loaded the firearm in the living room "to make [her] feel safer."

¶ 12 Later, another friend of Jones and the victim came by the victim's home, and Jones placed the gun under a futon in the back bedroom. The victim and the friend left together to go to a local brewery, and Jones remained at the victim's home alone. While

Jones was alone, another mutual friend visited the home looking for the victim and spent some time with Jones. The gun remained under the futon.

¶ 13    The mutual friend left and returned five to ten minutes later. During the time the mutual friend was gone, Jones "decided that [she] would lie down on the couch and rest." "[She] turned off all the lights in the house, [she] locked the doors, and [she] retrieved the .9 mm from the back bedroom." And she put the gun on the coffee table in the living room. When the mutual friend returned, he "rattled the doorknob" on the front door, knocked, and called out to Jones to let him in. Jones let him in. He retrieved a forgotten item and left again. Jones turned off the lights, relocked the front door, turned off her phone, and laid down on the couch.

¶ 14    Later that evening, Jones awoke to "[t]he rattling of the front doorknob and knocking." After a short moment, Jones heard "rattling of the doorknob" and "knocking at the back door." Then, Jones heard "loud banging and pounding" on the front door and "a loud sharp sound like a bang or a clap." Jones got underneath the coffee table. She began to hear "muffled noises coming from [the victim's] bedroom" and "footsteps." On hearing these noises, Jones

5

positioned herself to shoot at "whatever came through the door." Finally, the door to the living room opened, the victim walked into the room holding a flashlight, and Jones immediately shot the victim.

## II.     Jury Instructions

¶ 15     We first consider whether the trial court erred by declining to instruct the jury on (1) the affirmative defense of force against intruders and (2) self-defense under subsections (2)(b) and (2)(c) of the self-defense statute.  We conclude it did not.

### A.     Standard of Review

¶ 16     We review a trial court's decision to give, or not to give, a particular jury instruction for an abuse of discretion.  *People v. Payne*, 2019 COA 167, ¶ 16.

¶ 17     But to present an affirmative defense for the jury to consider, a defendant must offer "some credible evidence" to support it. *Pearson v. People*, 2022 CO 4, ¶ 16.  "Some credible evidence" has been understood to be interchangeable with "some evidence," "any credible [even if highly improbable] evidence," "a scintilla of evidence," a "small quantum of evidence," and "any evidence." *Galvan v. People*, 2020 CO 82, ¶ 24 (citations omitted).

6

¶ 18    "Whether a defendant has met this burden is a question of law, and we review the sufficiency of a defendant's evidence de novo." *Pearson*, ¶ 16. We review the record as a whole to determine if there is "any evidence tending to establish the [affirmative] defense." *People v. Garcia*, 113 P.3d 775, 784 (Colo. 2005) (quoting *Idrogo v. People*, 818 P.2d 752, 754 (Colo. 1991)).

## B.    Force Against Intruders

¶ 19    Jones contends that the trial court erred by declining to give an instruction on the affirmative defense of force against intruders because there was some evidence to support this affirmative defense. We disagree.

### 1.    The Law

¶ 20    Section 18-1-704.5, C.R.S. 2023, addresses the justified use of force against intruders in the home. *People v. Rau*, 2022 CO 3, ¶¶ 2-3. The statute recognizes "that the citizens of Colorado have a right to expect absolute safety within their own homes," § 18-1-704.5(1), and provides that citizens may use deadly physical force when certain specific conditions are met. *Rau*, ¶ 3. These specific conditions are that

7

(1) the defendant was an occupant of a dwelling; (2) another person made a knowingly unlawful entry into that dwelling; (3) the defendant had a reasonable belief that, in addition to the uninvited entry, the other person had committed, was committing, or intended to commit a crime against a person or property in the dwelling; and (4) the defendant reasonably believed that the other person might use any physical force (no matter how slight) against any occupant of the dwelling.

*Id.* at ¶ 21; *see also* § 18-1-704.5(2).

¶ 21    A defendant may assert the force-against-intruders statute as an affirmative defense at trial. *See People v. Guenther*, 740 P.2d 971, 981 (Colo. 1987). A defendant must present some credible evidence supporting the statute's applicability for the trial court to instruct the jury on this affirmative defense. *People v. Janes*, 962 P.2d 315, 317-18 (Colo. App. 1998), *aff'd*, 982 P.2d 300 (Colo. 1999).

¶ 22    But the plain language of the force-against-intruders statute "requires proof of an actual unlawful entry and not merely a reasonable belief that the entry was unlawful." *People v. McNeese*, 892 P.2d 304, 310 (Colo. 1995) (citing *Guenther*, 740 P.2d at 979).

8

## 2. Analysis

¶ 23 We conclude that the trial court did not err by declining to give the jury an instruction on the affirmative defense of force against intruders under section 18-1-704.5. We reach this conclusion because Jones did not make the threshold showing of the objective element of the statute — that the victim knowingly entered into the dwelling unlawfully. *See* § 18-1-704.5; *see also McNeese*, 892 P.2d at 309. Indeed, Jones conceded that there was no unlawful entry because she shot the victim in his own home.

¶ 24 Still, Jones contends that she has satisfied this element because (1) she was operating "under a mistaken belief [the victim] was an intruder"; and (2) section 18-1-504(1)(c), the mistake-of-fact statute, supports that the element may be satisfied by such a subjective belief. Jones also contends that she presented credible evidence supporting the defense by testifying about "the damage she observed on her property" and the damage to her deadbolt. She further contends that her testimony regarding the voicemails left by an unknown man looking for Taylor, and the violence these men perpetrated against Taylor qualify as credible evidence.

9

¶ 25    Jones's subjective belief that the victim was an intruder making an unlawful entry into the dwelling does not cure her inability to meet the objective element of the force-against-intruders statute. *See McNeese*, 892 P.2d at 309.

¶ 26    The cases on which Jones relies do not help her. In each case, the defendant had presented credible evidence of an unlawful entry. The appellate courts were therefore tasked with determining only whether the jury instructions supporting these defenses were proper. *See Janes*, 982 P.2d at 301 (evaluating whether instruction impermissibly conveyed the prosecution's burden of proof); *People v. Manyik*, 2016 COA 42, ¶ 74 (evaluating whether the jury was properly instructed on the defendant's affirmative defenses in relation to each other); *People v. Ujaama*, 2012 COA 36, ¶ 53 (evaluating whether the jury instruction erroneously misconstrued the prosecution's burden of proof and limited the defendant's right to respond with force).

## C.    Self-Defense

¶ 27    Jones next contends that the trial court erred by declining to fully instruct the jury regarding self-defense because there was

some evidence to support instructions on both subsection (2)(b) and subsection (2)(c) of the self-defense statute.  We disagree.

### 1.  The Law

¶ 28    Colorado's self-defense statute provides in part as follows:

> (2) Deadly physical force may be used only if a person reasonably believes a lesser degree of force is inadequate and:
>
> (a) The actor has reasonable ground to believe, and does believe, that he or another person is in imminent danger of being killed or of receiving great bodily injury; or
>
> (b) The other person is using or reasonably appears about to use physical force against an occupant of a dwelling or business establishment while committing or attempting to commit burglary as defined in sections 18-4-202 to 18-4-204; or
>
> (c) The other person is committing or reasonably appears about to commit kidnapping as defined in section 18-3-301 or 18-3-302, robbery as defined in section 18-4-301 or 18-4-302, sexual assault as set forth in section 18-3-402, . . . or assault as defined in sections 18-3-202 and 18-3-203.

§ 18-1-704(2)(a)-(c).

## 2.     Analysis Concerning Subsection (2)(b) of the Self-Defense Statute

¶ 29      We conclude that the trial court did not err by declining to instruct the jury on subsection (2)(b) of the self-defense statute.

¶ 30      Unsurprisingly, Jones and the People disagree about the standard we are to use to evaluate this issue.  Jones urges us to apply a subjective test.  She contends that the applicability of subsection (2)(b) was supported by credible evidence through her testimony regarding her fear "that the person entering the house was a member of the drug trafficking motorcycle gang [Taylor] was associating with, and that they were breaking into the house."

¶ 31      The People counter that we should apply an objective test.  They contend that there must be evidence that Jones acted as a reasonable person would in a similar situation.  We agree with the People.  The trial court correctly recognized that giving the requested instruction would be unjustified because it would not be based on a reasonable belief, at best, it would be based only on Jones's actual belief.

¶ 32      In *Toler*, a division of our court addressed an issue that "may arise on remand."  981 P.2d at 1098-99.  The division discussed

whether a trial court erred by refusing to instruct the jury that the "reasonable person" referenced in the self-defense instruction "must be measured by a subjective, not an objective, standard." *Id.* The division recognized that self-defense "under § 18-1-704 takes into account both the reasonable belief and the actual belief of the defendant" and determined that a "court may properly refuse to give an instruction which calls only for a subjective test." *Id.* at 1099.

¶ 33 We agree with the division's analysis in *Toler* and conclude that the trial court here properly refused to give a self-defense instruction under subsection (2)(b) of the self-defense statute because it would have called only for a subjective test. *See id.*

¶ 34 There was no evidence that the victim was "using or reasonably appear[ed] about to use physical force against" Jones. § 18-1-704(2)(b). Jones herself testified that, upon hearing noises, she positioned herself to shoot at "whatever came through the door." She thus had committed herself to shooting the perceived intruder before she could identify him or his purpose. And there was no evidence that the victim took any actions that would make it appear that he was about to use physical force against Jones.

¶ 35    There also was no evidence that the victim, the alleged intruder, entered his home that night "while committing or attempting to commit burglary." *Id.* It was undisputed that the victim was reentering his own home and therefore there could be no burglary. *See* § 18-4-201(3), C.R.S. 2023 ("A person 'enters unlawfully' or 'remains unlawfully' in or upon premises when the person is not licensed, invited, or otherwise privileged to do so.").

### 3.    Analysis Concerning Subsection (2)(c) of the Self-Defense Statute

¶ 36    Agreeing with the division's analysis in *Toler* again, we conclude that the trial court properly refused to give a self-defense instruction under subsection (2)(c) of the self-defense statute.

¶ 37    Jones contends that an instruction under section 18-1-704(2)(c) was supported by credible evidence from her testimony that "[s]he felt she was in danger of being kidnapped, sexually assaulted, or assaulted" due to the damage to her property and "receiving phone calls from a man who addressed [her] by name in voicemails, whom [she] had never met."

¶ 38    We disagree with Jones because there was no evidence that the victim was committing or "reasonably appear[ed] about to

14

commit" kidnapping, sexual assault, or assault. § 18-1-704(2)(c); *see also Toler*, 981 P.2d at 1099. Again, the evidence was that Jones shot the victim immediately after he entered his living room and before she identified him. When she heard someone entering the home, she decided to shoot "whatever came through the door."

¶ 39 And as the trial court noted, there also was a lack of propensity or past history that would suggest the victim was coming into his home to commit sexual assault, kidnapping, or assault.

¶ 40 In light of the complete lack of credible evidence, we conclude that the trial court did not err by declining to instruct the jury under subsections (2)(b) and (2)(c) of the self-defense statute.

### III. Expert Testimony

¶ 41 Jones next contends that the trial court violated her rights under the Confrontation Clause by admitting the victim's testimonial statements made to the police that he had entered his home through the front door. This testimony came from a police report that the expert witness reviewed. Jones argues that this error was harmful because "whether the victim had entered through the front door or through the bedroom doorway became a focal

point of the trial." We conclude that any such error does not require reversal.

## A. Law

¶ 42 The Confrontation Clause bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004).

## B. Standard of Review

¶ 43 We review a trial court's evidentiary ruling for an abuse of discretion and therefore look to whether the ruling was manifestly arbitrary, unreasonable, or unfair, or reflects an erroneous understanding or application of the law. *People v. Brown*, 2022 COA 19, ¶ 57. But we review de novo whether a statement violated a defendant's rights under the Confrontation Clause. *People v. Ambrose*, 2021 COA 62, ¶ 65.

¶ 44 We review preserved Confrontation Clause violations under the constitutional harmless error standard. *Hagos v. People*, 2012 CO 63, ¶ 10. These errors require reversal unless they were harmless

16

beyond a reasonable doubt.  *Id.*  In evaluating constitutional harmlessness, we look to the following:

> (1) the importance of the declarant's statement to the prosecution's case; (2) whether the statement was cumulative; (3) the presence or absence of corroborating or contradictory evidence on the material points of the witness's testimony; (4) the extent of the cross-examination otherwise permitted; [and] (5) the overall strength of the prosecution's case.

*People v. Phillips*, 2012 COA 176, ¶ 93 (quoting *Arteaga-Lansaw v. People*, 159 P.3d 107, 110 (Colo. 2007)).

### C. Analysis

¶ 45    During the trial, defense counsel asked Jones's expert witness about what he had reviewed in preparing his opinion.  The expert witness testified that he had reviewed several pieces of evidence for his report, which included the victim's statement that he entered through the front door.  Defense counsel then asked the expert witness if he had considered the evidence regarding the victim's entrance to his home and whether the police's subsequent investigation was "to [the expert witness's] satisfaction?"  He answered, "[n]o."  This testimony implicated the victim's statement to police officers that he had entered the house through the front

17

door, not the bedroom window. But the jury also heard the expert witness opine that, despite the victim's statements, he felt that there was a possibility the victim could have entered some way other than through the front door.

¶ 46    We conclude that any error in admitting the victim's testimonial statements that he had entered through the front door was harmless beyond a reasonable doubt. We reach this conclusion for two reasons.

¶ 47    First, the victim's statements were limited to a factual dispute that was not dispositive to the jury's determination of Jones's guilt. *Id.* The victim's entry into his house was lawful. As we have concluded, this fact meant Jones was not entitled to invoke the force-against-intruders statute. And because Jones had committed herself to shooting the perceived intruder before identifying him or his purpose, there was no reasonable basis to believe the intruder "appear[ed] about to use physical force" under section 18-1-704(2)(b) or was about to commit one of the listed crimes under section 18-1-704(2)(c).

¶ 48    Thus, Jones's only applicable defense under section 18-1-704(2)(a) required some evidence that she reasonably believed that

18

the perceived intruder presented an "imminent danger." Jones created the circumstances that required the victim to purportedly enter through the bedroom window because she had locked the front door. Whether the victim entered his home through the door or the window, neither provides a rational basis for her mistaken belief because Jones does not identify any evidence of imminent danger.

¶ 49 Second, the admitted statements had little relevance to the jury's determination. *Phillips*, ¶ 93. The jury understood that there was at least *some* possibility that the victim had entered through the bedroom window. And as we have concluded, the victim's purported entry into his own home has little significance because no matter the point of entry, the victim lawfully entered his own home and Jones failed to identify any imminent danger before shooting the victim.

¶ 50 Accordingly, we conclude that any error in admitting the victim's testimonial statements was harmless beyond a reasonable doubt.

## IV.    Prosecutorial Misconduct

¶ 51    Jones last contends that the prosecutor committed misconduct during voir dire.  We disagree.

### A.    Law

¶ 52    Every person has a right to a trial by a fair and impartial jury. *Domingo-Gomez v. People*, 125 P.3d 1043, 1048 (Colo. 2005).  It is well settled in Colorado law that "a prosecutor, while free to strike hard blows, is not at liberty to strike foul ones."  *Id.* (quoting *Wilson v. People*, 743 P.2d 415, 418 (Colo. 1987)).  Prosecutors may employ legitimate means to bring about a just conviction, and they have a duty to avoid improper methods designed to obtain an unjust result.  *Id.*

### B.    Standard of Review

¶ 53    We employ a two-step analysis to allegations of prosecutorial misconduct.  *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010). First, we must determine whether the prosecutor's alleged misconduct was, in fact, improper based on the totality of the circumstances.  *Id.*  Second, if so, we must determine whether the alleged misconduct warrants reversal according to the proper standard of review.  *Id.* at 1097.

¶ 54    Because Jones's counsel did not object to the prosecutor's challenged conduct during voir dire, we review for plain error. *Hagos*, ¶ 14. An error is plain if it is "obvious and substantial," and we will reverse only if the error so undermined the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction. *Id.*

## C.    Analysis

¶ 55    Jones alleges five separate instances of prosecutorial misconduct during voir dire. We address and reject each in turn.

¶ 56    First, Jones contends that the prosecutor indoctrinated the jury by suggesting that he had "personal knowledge of information in support of the case that would not be presented because he had to decide what to present the jury."

> PROSECUTOR: How do I know what should I [sic] bring for you to consider in this case? Say it louder.
>
> THE JUROR: Something that's believable.
>
> PROSECUTOR: Something that's believable. And, again, that's [the juror]. Right. Okay. Very good point. Reliable, credible, right? Let me ask you this question to help it out. Can I bring you in the next five to six days every single fact that there is associated with this

case? [Juror], you want me to bring every single little tiny thing I know about this case?

THE JUROR: Well, it has to be pertinent to what you're presenting.

PROSECUTOR: Has to be pertinent, has to be relevant. Plus you only signed up for six days, right? So there's gotta be a — I have to know what's pertinent, and there has to be some limits, right? Exactly. Does anybody have a problem with that? You know, let's put this down to brass tacks. When you go to deliberate, there may be some things that you didn't know, that you didn't learn. Can you still make a decision? Who has had a situation like that in your work? You have to make a decision; but, you know, did you know absolutely every little thing about it? [Juror], you're shaking your head.

THE JUROR: Like would you like an example?

PROSECUTOR: I would.

THE JUROR: Well, I had to fire someone yesterday at my work. And so in that case I felt like I used the best information I could to make the decision. It's not one I was excited about, but I objectively evaluated the facts that I knew and had to decide how I would take action.

THE COURT: Yes. What a great example, because having to terminate someone from employment is an important decision. I mean, it's one of those that really matters.

THE JUROR: Uh-huh.

> PROSECUTOR: But at some point you have to make a decision.

¶ 57 The prosecutor's statements did not mistate or oversimplify the burden of proof. *See People v. Vialpando*, 2022 CO 28, ¶ 41. Rather, the prosecutor's line of questioning focused on the task the jurors would face: weighing the evidence presented to them. This was a proper line of inquiry. *See People v. Adams*, 708 P.2d 813, 815 (Colo. App. 1985).

¶ 58 Second, Jones contends that the prosecutor told the jurors that they could convict based on less than proof beyond a reasonable doubt.

> PROSECUTOR: Does [defense counsel] and the defense ever have the burden of producing any evidence for you?
>
> [Juror answers no.]
>
> PROSECUTOR: You were right, they don't have to produce anything, do they, any evidence? The defense doesn't have to produce anything, right? That's another really important concept in a criminal courtroom, isn't it, that the defendant doesn't have to do that? Who has to present you with the evidence? We do.
>
> [Defense counsel] has no burden at any time to produce any evidence. He doesn't have to really do anything. He will because he's going

to represent Ms. Jones and her interests, but he doesn't have to bring you any evidence.

¶ 59     The prosecutor's statements focused on ensuring that the jury understood the defense bore no burden of proof, and that the jury understood that the prosecution carried the burden to prove its case beyond a reasonable doubt.  This was proper inquiry.  *See Vialpando*, ¶ 41.

¶ 60     Third, Jones contends that the prosecutor sought to "discredit [her] mistake-of-fact defense" and asked the jurors not to let this defense influence them from holding Jones accountable.

> PROSECUTOR: So the issue here is does murder require that you kill — that you intended to kill the person that ended up dying?  That's the issue.  It might, right; but it doesn't always.  Does everybody agree with that?  [Juror S], any comments about that? . . .
>
> JUROR: You always hear about drunk driving accidents where somebody is killed.  That can be murder.
>
> PROSECUTOR: Can you imagine if the rule was, well, if you cause somebody to die, but it wasn't who you were trying to kill, that you got off?  Can you imagine if that was the rule?  Well, yeah.  I caused somebody to die, but that wasn't who I was trying to kill.  Does that mean the person should not be held accountable for that?

JUROR: No.

PROSECUTOR: Anybody struggling with that at all?  Okay.

¶ 61    The prosecutor's statements did not tell the jurors to discredit the mistake-of-fact defense.  On the contrary, the prosecutor was asking whether the jurors could apply the law to the concept of an unintentional killing.  This was a proper line of inquiry.  *See id.*

¶ 62    Fourth, Jones contends that the prosecutor's discussion regarding guns, hunting, and military training was improper because the line of questioning "had nothing to do with the facts or evidence in this case."  But both parties submitted a stipulated questionnaire inviting the prospective jurors to address their experiences with firearms, firearm training, and the military.  Therefore, we conclude that Jones invited the error she now complains about on appeal.  *See People v. Rediger*, 2018 CO 32, ¶ 34 ("We have thus concluded that a party invites an error in a jury instruction when that party drafted or tendered the erroneous instruction.").

¶ 63    Fifth, Jones contends that the prosecutor's discussion of the inapplicability of the force-against-intruders law was improper.  We

disagree because the parties again stipulated to providing a jury questionnaire that explicitly asked jurors to describe their understanding of this law.  And when the trial court discussed the applicability of the force-against-intruders law, it asked Jones's attorney if he would be comfortable with the statute's inapplicability being disclosed in voir dire, if the trial court reached such a conclusion.  Jones's attorney agreed to this.  Therefore, we conclude that Jones invited the error.  *See id.*

## V.    Conclusion

The judgment of conviction is affirmed.

JUDGE FOX and JUDGE PAWAR concur.