22CA1157 Peo v Apodaca 11-13-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA1157
Pueblo County District Court No. 20CR1754
Honorable Thomas B. Flesher, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Issaiah Lee Apodaca,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE SCHOCK
Harris and Berger*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 13, 2025

Philip J. Weiser, Attorney General, Frank R. Lawson, Senior Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Shann Jeffery, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1    Defendant, Issaiah Lee Apodaca, appeals his conviction and sentence for first degree murder.  He argues that the district court erred by (1) declining to instruct the jury on the lesser included offenses of manslaughter and criminally negligent homicide and (2) excluding evidence of the gang affiliations of individuals involved in the incident.  He also contends that his statutorily mandated sentence of life imprisonment without the possibility of parole is unconstitutional given his young age.  We affirm the judgment.

## I.    Background

¶ 2    There was evidence at trial to support the following facts.  Apodaca was at the mall with his brother, Gary Apodaca,[1] and his friend, L.J-D.,[2] when they encountered the victim and his friend, Austin Aragon.  The two groups, who knew each other and did not get along, got into a verbal altercation, calling each other names.

¶ 3    The altercation picked back up in the mall parking lot.  The groups again argued, calling each other names and "disrespecting each other's dead friends."  L.J-D. pulled out a gun, which Gary

---

[1] Because Gary Apodaca shares defendant's last name, we refer to him by his first name, intending no disrespect.

[2] We refer to L.J-D. by his initials because he was a minor.

took and put in his waistband. According to L.J-D., Aragon also appeared to be holding a gun in his waistband and threatened to shoot the other group. Aragon later denied that he had a gun.

¶ 4 The two groups then drove off, the victim driving with Aragon in one car, and the others, with Gary driving, following in another. As the victim stopped at a stoplight, Gary pulled up next to him and the groups continued to argue. Apodaca then pointed a gun at the victim and Aragon. He lowered the gun after "a second or two" and taunted them for being "scared." But when the stoplight turned green and the victim began to drive forward, Apodaca raised the gun again and fired a single shot into the victim's car, striking the victim in the head and killing him. L.J-D. originally told police that Aragon had pointed a gun at the car with Apodaca's group first. But at trial, L.J-D. denied ever seeing Aragon draw a gun.

¶ 5 Apodaca was charged with first degree murder after deliberation. His primary defense at trial was that he had acted in self-defense after Aragon pointed a gun at him. The jury convicted Apodaca, and the district court sentenced him to life in prison without the possibility of parole, as mandated by statute.

## II. Denial of Lesser Included Offense Instructions

¶ 6    Apodaca first contends that the district court reversibly erred by denying his request to instruct the jury on the lesser included offenses of manslaughter and criminally negligent homicide. We disagree. We conclude that the district court properly declined to instruct the jury on criminally negligent homicide and that any error in failing to instruct the jury on manslaughter would be harmless in light of the instruction on second degree murder.

### A. Applicable Law and Standard of Review

¶ 7    A district court must instruct the jury on a lesser included offense if "there is a rational basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense." § 18-1-408(6), C.R.S. 2025. In a homicide case, "[o]nly a slight amount of evidence" supporting the lesser included offense is required. *Grissom v. People*, 115 P.3d 1280, 1287 (Colo. 2005). If there is "any evidence whatever" tending to establish the lesser offense, "the defendant is entitled to an instruction thereon, regardless of how 'incredible or unreasonable' his contention may be, or how 'improbable, unreasonable, or slight' it might be." *Mata-Medina v. People*, 71 P.3d 973, 979 (Colo. 2003) (citations omitted).

In making this determination, the district court must consider the evidence in the light most favorable to the defendant. *Id.*

¶ 8 We review the denial of a lesser included offense instruction for an abuse of discretion. *People v. Buell*, 2017 COA 148, ¶ 31, *aff'd*, 2019 CO 27. A district court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair, or when it misapplies the law. *People v. Draper*, 2021 COA 120, ¶ 16, *overruled on other grounds by*, *Garcia v. People*, 2023 CO 30, ¶ 22.

¶ 9 When the district court errs by failing to give a jury instruction on a lesser included offense, we review for nonconstitutional harmless error. *Mata-Medina*, 71 P.3d at 980. Under that standard, we will reverse only if there is "a reasonable probability that [the error] contributed to the defendant's conviction." *Id.*

### B.   Analysis

¶ 10 As charged in this case, first degree murder requires that the defendant caused the death of another person "[a]fter deliberation and with . . . intent." § 18-3-102(1)(a), C.R.S. 2025. At Apodaca's request, the district court also instructed the jury on the lesser included offense of second degree murder — "knowingly caus[ing] the death of a person." § 18-3-103(1)(a), C.R.S. 2025. But the

4

court denied Apodaca's request for instructions on the still lesser offenses of manslaughter and criminally negligent homicide.

¶ 11 As to criminally negligent homicide, we perceive no abuse of discretion. That offense requires proof that the defendant caused the death of another person "by conduct amounting to criminal negligence." § 18-3-105, C.R.S. 2025. A person acts with criminal negligence "when, through a gross deviation from the standard of care that a reasonable person would exercise, he *fails to perceive* a substantial and unjustifiable risk that a result will occur or that a circumstance exists." § 18-1-501(3), C.R.S. 2025 (emphasis added).

¶ 12 On the facts of this case, there was no rational basis for a jury to conclude that Apodaca was unaware of the risk that, by shooting into the victim's car, he might kill someone. The uncontroverted evidence established that Apodaca deliberately fired from an adjacent lane at a car he knew contained two occupants. He did not claim to have shot inadvertently or without knowing what he was doing. *Cf. People v. Castro*, 10 P.3d 700, 702 (Colo. 2000) (holding that district court erred by failing to instruct on criminally negligent homicide where the defendant was intoxicated and did not remember shooting gun). If the jury found Apodaca acted in self-

defense, then it would have acquitted him. But otherwise, it "defies logic" to conclude that Apodaca did not perceive the substantial and unjustifiable risk of shooting into an occupied car. *Draper*, ¶ 21.

¶ 13    The manslaughter instruction is a closer call. A person commits manslaughter when "[s]uch person recklessly causes the death of another person." § 18-3-104(1)(a), C.R.S. 2025. And a person acts recklessly when they "consciously disregard[] a substantial and unjustifiable risk that a result will occur or that a circumstance exists." § 18-1-501(8). There is arguably *some* evidence to support a jury finding that Apodaca shot at the victim's car merely recklessly — perhaps to scare the witness or Aragon — but did not intend to kill anyone or know he was practically certain to do so. Specifically, L.J-D. testified that when Apodaca fired his gun, both cars were moving, the victim's windows were rolled up, and he could only "kind of" see inside the victim's car. And the bullet did not go directly through the victim's driver's side window; instead, it went through the closed back left window.

¶ 14    But even assuming the district court erred by failing to instruct the jury on manslaughter, we conclude that any error was

harmless.[3]  When a jury is instructed on a lesser included offense but convicts the defendant of the greater offense, the failure to instruct the jury on a further lesser included offense of the one the jury was instructed on is harmless error.  *Mata-Medina*, 71 P.3d at 982.  That is because "a jury's rejection of an intermediate offense constitutes an implicit rejection of omitted lesser [included] offenses."  *Id.* at 983; *see also People v. Roman*, 2017 CO 70, ¶ 18 (noting that the jury's finding in *Mata-Medina* that the defendant caused the victim's death knowingly rather than recklessly "foreclosed any possibility that it could have found he did so only by acting with criminal negligence").[4]  It also ensures that the jury did not convict the defendant of the greater offense "simply because it had no less serious option short of acquittal."  *Roman*, ¶ 20.

---

[3] Our harmlessness analysis would apply to the district court's rejection of the criminally negligent homicide instruction as well.

[4] In *People v. Roman*, the supreme court held that when the omitted lesser included offense is *not* also included in the lesser offense the jury was instructed on, "more is required to demonstrate harmlessness than merely the rejection of [the] comparable lesser offense."  2017 CO 70, ¶ 19.  But under the circumstances here, the conviction on the greater offense is not just "the rejection of a *comparable* lesser offense."  *Id.* (emphasis added).  It is the rejection, albeit implicit, of the omitted offense itself.  *Id.* at ¶ 18.

¶ 15   That is what happened in this case.  The jury was instructed on both first degree murder and the lesser included offense of second degree murder.  Thus, if the jury was unconvinced that Apodaca was guilty of first degree murder, it had an option short of acquittal.  But the jury convicted Apodaca of first degree murder, finding that he acted intentionally and after deliberation, not merely knowingly.  By doing so, the jury necessarily rejected all lesser included offenses of second degree murder, including manslaughter (and criminally negligent homicide).  *See Mata-Medina*, 71 P.3d at 983.  The district court's failure to instruct the jury on manslaughter, even if erroneous, was therefore harmless.  *See id.*

¶ 16   Apodaca contends that the putative error was not harmless because the jury could have found him guilty of manslaughter based on a theory of imperfect self-defense, despite rejecting the second degree murder charge.  Imperfect self-defense — a theory that has not been expressly recognized in Colorado — provides that a defendant who "subjectively believed that the use of deadly force was necessary to prevent death or great bodily harm to himself or others, but [whose] belief was not objectively reasonable," is guilty of manslaughter.  *United States v. Britt*, 79 F.4th 1280, 1287 (10th

8

Cir. 2023); *cf. Sanchez v. People*, 470 P.2d 857, 860 (Colo. 1970) (holding that the defendant could be convicted of manslaughter where he did *not* intend to kill the victim). Apodaca argues that the jury could have rejected second degree murder because he shot the victim intentionally but convicted him of manslaughter because he subjectively (but unreasonably) believed deadly force was necessary.

¶ 17     There are three problems with this argument. First, to the extent Colorado has recognized some form of imperfect self-defense, it is only because such a theory can "negate the elements of first- and second-degree murder." *People v. Miller*, 529 P.2d 648, 649 (Colo. 1974). No Colorado case suggests that a defendant who subjectively but unreasonably fears for their life may only be convicted of manslaughter despite — as the jury found here — *intending* to kill the victim. *See People v. Jones*, 2023 COA 104, ¶¶ 33-35 (affirming second degree murder conviction and holding that the defendant was not entitled to assert self-defense where the defendant's claimed subjective fear was not objectively reasonable).

¶ 18     Second, even if the law in Colorado could support such a theory, the jury was not instructed on it. Without such an instruction, the jury would have had no basis to find that Apodaca's

9

actions — if short of first degree murder — could *only* support a manslaughter conviction and not second degree murder.

¶ 19    Third, to the extent Apodaca suggests in his reply brief that the district court should have given an imperfect self-defense instruction, he never requested one, and he did not raise this issue in his opening brief. *See People v. Dominguez*, 2024 COA 32, ¶ 11 (declining to address issue first raised in reply brief) (*cert. granted in part* Dec. 23, 2024). Nor could Apodaca show plain error given the lack of any Colorado case law recognizing imperfect self-defense as Apodaca frames it on appeal. *See People v. Crabtree*, 2024 CO 40M, ¶ 42 ("[T]o be deemed plain, an error must contravene a clear statutory command, a well-settled legal principle, or established Colorado case law.").

¶ 20    Finally, to the extent Apodaca suggests that *Mata-Medina* does not apply to *any* case involving self-defense, we see no basis for that distinction. When asserted as an affirmative defense, as in this case, self-defense is a "complete defense." *Galvan v. People*, 2020 CO 82, ¶ 20. Thus, by convicting Apodaca of first degree murder, the jury necessarily found that Apodaca did not act in self-defense.

It follows that self-defense offered no basis for a jury to convict Apodaca of manslaughter despite rejecting second degree murder.

¶ 21 We therefore conclude that, under the facts of this case, there is no reasonable probability that a jury presented with a lesser included instruction on manslaughter would have convicted Apodaca of that offense and acquitted him of first degree murder.

## III. Gang-Related Evidence

¶ 22 Apodaca next argues that the district court erred by precluding him from cross-examining Aragon, L.J-D., and another witness about the gang affiliations of the two groups.[5] He argues that such evidence was relevant to (1) the bias of the witnesses and (2) Apodaca's reasonable fear. We perceive no abuse of discretion.

## A. Additional Background

¶ 23 Initially, the prosecution framed this case as one of gang violence and sought, over Apodaca's objection, to admit evidence that the two groups were affiliated with rival gangs. Specifically, the prosecution alleged that Apodaca and Gary were Ace gang members, Aragon was a Duke Sureno gang member, and the Duke

---

[5] Apodaca also refers to "evidence of prior violent events," but he does not identify any such events in his opening brief.

Sureno gang is a rival of the Ace gang. But after a pretrial hearing where Aragon testified that the altercation was unrelated to the parties' gang affiliations, the prosecution abandoned this theory.

¶ 24 Defense counsel, however, maintained that the parties' gang affiliation was a "key component" of Apodaca's self-defense claim because it explained the reasonable basis for his fear of the victim and Aragon. She said Apodaca was not a gang member but believed he was targeted due to his affiliation with Gary, who was.

¶ 25 The district court ruled that the prosecution could not make any gang-related references during its case-in-chief. But it did not bar the defense from doing so. Instead, it told the defense that if it wanted to introduce evidence of particular gang-related incidents during its case, it should raise those issues outside the presence of the jury. The court later clarified that evidence of prior incidents in which Apodaca was targeted by members of the Duke gang *other than* Aragon or the victim would not be admitted.

¶ 26 Before Aragon testified, the prosecution reiterated its position that gang membership was irrelevant. The court explained that it had not closed the door on such evidence and that it would rule on relevance when the questions were asked. Defense counsel later

sought to cross-examine Aragon about his and Gary's gang affiliation because "the hostilities between [Aragon] and Gary . . . started over them being in rival gangs." The court sustained the prosecution's objection, concluding that gang affiliation was not relevant "based on the state of the evidence" at that point.

¶ 27 Later, the prosecution called another witness, A.O., who had seen the altercation between the two groups in the parking lot. Again, defense counsel sought to cross-examine her on the groups' gang affiliations. Outside the presence of the jury, A.O. testified that (1) she grew up with Aragon and knew the victim through Aragon; (2) Aragon was a Duke gang member and she believed (but was not sure) that the victim was a member of a different gang; (3) Gary was a member of the Ace gang; (4) members of the Ace gang did not like her or her family; and (5) she made a derogatory remark about Ace gang members during the altercation. Defense counsel argued that this testimony was relevant to A.O.'s credibility and her bias toward Aragon and the victim and against Apodaca.

¶ 28 The district court ruled that defense counsel could cross-examine A.O. on her relationship with Aragon and the victim, as well as the derogatory remark she made toward Gary and Apodaca.

13

But the court prohibited defense counsel from asking A.O. about Aragon's or the victim's gang affiliation because it was irrelevant.[6]

## B. Standard of Review and Applicable Law

¶ 29 We generally review evidentiary rulings, including limitations on cross-examination, for an abuse of discretion. *People v. Beverly*, 2025 CO 18, ¶ 22; *People v. Morse*, 2023 COA 27, ¶ 42. A district court abuses its discretion when its ruling is "manifestly arbitrary, unreasonable, or unfair, or stems from an erroneous view of the law." *Beverly*, ¶ 22. To the extent Apodaca contends that the evidentiary rulings violated his constitutional rights, we review that issue de novo. *People v. Reynolds-Wynn*, 2024 COA 33, ¶ 31.

¶ 30 A defendant has a constitutional right to present a defense and cross-examine witnesses, especially as to "bias, prejudice, or motive for testifying." *People v. Gonzales-Quevedo*, 203 P.3d 609, 611, 614 (Colo. App. 2008) (citation omitted). But a district court has wide latitude to place reasonable limitations on cross-

---

[6] Apodaca also asserts in his opening brief that L.J-D. was precluded from testifying about the parties' gang affiliations and gang rivalry, but he does not point to anywhere in the record that he sought to cross-examine L.J-D. on these issues. To the extent he suggests that the court's prior rulings prevented him from doing so, our analysis below would apply to L.J-D.'s testimony as well.

14

examination to, among other things, prevent prejudice and issue confusion. *Id.* at 614-15. A court may also limit cross-examination that is "only marginally relevant." *Id.* at 615 (citation omitted).

¶ 31 A witness's gang affiliation may be admissible to show bias in favor of someone who is affiliated with the same gang or against someone who is not. *Id.* It may also be admissible to "explain a circumstance of the crime [or] to show a motive for the crime." *People v. James*, 117 P.3d 91, 94 (Colo. App. 2004) (citation omitted). In addition, a victim's prior violent acts, known to the defendant at the time, may be relevant to the reasonableness of the defendant's belief in the need for self-defense. *People v. Jones*, 675 P.2d 9, 17 (Colo. 1984).

¶ 32 But gang-related evidence must be "admitted with care." *People v. Trujillo*, 2014 COA 72, ¶ 72 (citation omitted). As with all evidence, it must be relevant under the facts of the case — that is, it must have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." CRE 401; *see also People v. Chavez*, 2012 COA 61, ¶ 32 ("Absent a specific basis for admission, . . . evidence of mere gang association is irrelevant.").

And even if marginally relevant, it may be excluded if its probative value is substantially outweighed by the danger of confusion and unfair prejudice. *Gonzales-Quevedo*, 203 P.3d at 615; CRE 403.

### C. Bias

¶ 33    To the extent Apodaca sought to present evidence of the parties' gang affiliations for the purpose of showing witness bias, the district court did not abuse its discretion by excluding it.

¶ 34    The only witness for whom Apodaca advanced this theory of admissibility was A.O. But A.O. testified (outside the presence of the jury) that she was not in a gang. And there was no evidence that Apodaca was in a gang either. Although A.O. testified that Ace gang members did not like her or her family, her relationship with Aragon (and to some extent, the victim) came from growing up together, "before anything gang-related." A.O. did not have personal knowledge that Gary was in a gang and believed the victim was a member of a different gang — neither the Duke gang nor the Ace gang. Given this evidence, the suggestion that A.O. would be biased toward Aragon and the victim and against Apodaca *based on their gang affiliations* (or in the case of Apodaca, *his brother's* gang affiliation) rested predominantly on "generalities about gang

membership and not on specific facts." *Chavez*, ¶ 41; *see also*

*Gonzales-Quevedo*, 203 P.3d at 615 (affirming limits on cross-

examination into topics that were "speculative and conclusory").

¶ 35    Moreover, the district court allowed defense counsel to cross-

examine A.O. about her relationship with Aragon and the victim.

The court also allowed cross-examination regarding A.O.'s

derogatory remark to Apodaca and his brother. *See Chavez*, ¶ 44

(holding that district court did not err by excluding evidence of the

victims' gang affiliation where the defendant introduced "evidence of

bias and animosity between the parties without relying on evidence

of the victims' gang affiliation"). This was enough to call A.O.'s

neutrality into question without getting into the tangential and

potentially prejudicial issue of who belonged to what gang.

¶ 36    As to the cross-examination of Aragon, defense counsel never

argued that his gang affiliation was relevant to bias. She argued

only that his gang affiliation was relevant because the animosity

between Gary and Aragon was due to their membership in rival

gangs. But again, there was no evidence that the altercation was

gang related. *See id.* at ¶ 43 (holding that gang affiliation was

irrelevant where "there was no evidence that the incident was gang-

related").  And as with A.O., Aragon testified that he did not get along with Apodaca's group, regardless of why.  *See id.* at ¶ 44.

¶ 37    Under these circumstances, the district court did not abuse its discretion by concluding that the gang affiliations of Gary, Aragon, and the victim were not relevant to the witnesses' credibility.

## D.    Reasonable Fear

¶ 38    Apodaca also argues that the parties' gang affiliations were relevant to the reasonableness of his fear of Aragon and the victim and, thus, to his claim of self-defense.  Although he made this argument generally before trial, he did not raise it as a ground for his request to cross-examine Aragon or A.O. on this issue.  But even assuming this argument is preserved, we perceive no error.

¶ 39    We first reject the notion that gang membership, without more, is necessarily admissible to show that a defendant reasonably feared the victim for purposes of a claim of self-defense.  *See Chavez*, ¶ 32 (requiring "specific basis for admission"); *cf. Trujillo*, ¶ 64 (holding that evidence of gang culture was inadmissible without a connection to the charged crimes).  Membership in a gang is not a violent act.  *See Jones*, 675 P.2d at 17.  Nor is it, in and of itself, evidence of an individual's violent disposition.  *See id.*

¶ 40    But as to Aragon and A.O., "mere gang association" is all there was. *Chavez*, ¶ 32. Apodaca did not seek to cross-examine Aragon or A.O. about a specific prior act of violence by Aragon or the victim. *See Jones*, 675 P.2d at 17. He merely wanted to show that Aragon and Gary were in rival gangs. Without more, such gang affiliation — even if a cause of the verbal altercation — was not relevant to whether Apodaca reasonably believed he was in imminent danger of being killed or greatly injured. *See* § 18-1-704(2)(a), C.R.S. 2025.

¶ 41    In his reply brief, Apodaca argues that the district court erroneously excluded testimony from his girlfriend that Aragon had previously threatened Apodaca and had allegedly shot at a home Apodaca was in. But although the People raised this issue in their *answer* brief, Apodaca never mentioned it in his opening brief. We will not consider a claim of error that Apodaca raised only in his reply brief. *See People v. Dubois*, 216 P.3d 27, 28 (Colo. App. 2007), *aff'd*, 211 P.3d 41 (Colo. 2009).

## E.    Constitutional Rights

¶ 42    We likewise reject Apodaca's claim that his constitutional rights were violated by the exclusion of the gang-related evidence.

¶ 43    The district court did not "excessively limit cross-examination." *Chavez*, ¶ 31.  It simply barred any reference to gang affiliations where the witnesses' direct testimony did not address it and there were no facts to suggest that the incident was gang related or that the witnesses' testimony was influenced by the parties' gang affiliations.  Subject to this limitation, Apodaca was permitted to cross-examine the witnesses about the animosity between the two groups, A.O.'s animosity toward Apodaca's group, and A.O.'s relationship with Aragon.  *See id.* at ¶ 35.  For the reasons above, these limitations were reasonable.  *See id.* at ¶ 31.

¶ 44    Apodaca also was not deprived of his opportunity to present a meaningful defense.  *See People v. Sauser*, 2020 COA 174, ¶ 57.  To the contrary, he pursued his self-defense theory throughout trial, including by eliciting testimony from L.J-D. that Aragon appeared to have a gun in the parking lot and that L.J-D. previously told police that Aragon pointed a gun at them at the stoplight.  Without some specific basis for Apodaca to reasonably fear Aragon or the victim, the gang affiliations of Gary and Aragon (but not Apodaca himself) were, at best, ancillary to Apodaca's fundamental narrative that he reasonably feared for his life because Aragon threatened

him with a gun. *See id.* at ¶ 60 (holding that exclusion of testimony did not deprive the defendant of his right to present a defense where it "would have expanded on" the defense, "but was not necessary to make it coherent"). And in any event, the constitutional right to present a defense must yield to ordinary limitations of relevance and admissibility. *See People v. Salazar*, 2012 CO 20, ¶ 17.

## IV. Constitutionality of Sentence

¶ 45 Apodaca finally argues that sections 18-3-102 and 18-1.3-401(4)(a), C.R.S. 2025 — which, together, mandated a sentence of life imprisonment without the possibility of parole (LWOP) — are unconstitutional as applied to him because he was only nineteen years old at the time of his offense. He urges us to extend the constitutional ban on mandatory LWOP sentences for juveniles, *see Miller v. Alabama*, 567 U.S. 460, 479 (2012), to "emerging adults" who share similar developmental characteristics. Notwithstanding some intuitive appeal to this argument, we are not persuaded.

¶ 46 The supreme court recently considered this argument in *People v. Ray*, 2025 CO 42M. Like Apodaca, the defendant in *Ray* was nineteen years old at the time of his offense and argued that, as an "emerging adult," he should be included in the prohibition on

LWOP sentences for juveniles. *Id.* at ¶ 174. The supreme court did not definitively decide the issue because it concluded that the defendant had received "individualized consideration" of his "youth and attendant characteristics" during the penalty phase of his capital trial. *Id.* at ¶¶ 178-79 (citation omitted). But in doing so, the court explained that the Colorado legislature and the United States Supreme Court recognize eighteen as the age that divides juveniles — who cannot be sentenced to mandatory LWOP — from adults — who can. *Id.* at ¶ 176. And it noted that "Colorado has not yet followed suit" of other states that have expanded this prohibition to include defendants older than eighteen. *Id.* at ¶ 177.

¶ 47    We may not expand the boundaries of the Eighth Amendment beyond those set by the United States Supreme Court. As a general matter, "an LWOP sentence imposed upon a class-1-felony conviction is facially constitutional." *Id.* at ¶ 175. In carving out an exception for juveniles, *Miller* drew the line between children and adults — not between categories of adults or between those adults whose brains are fully developed and those whose brains are not. 567 U.S. at 471. And the United States Supreme Court has drawn the line between childhood and adulthood for purposes of the

22

Eighth Amendment at the age of eighteen — "where society draws the line for many purposes." *Roper v. Simmons*, 543 U.S. 551, 574 (2005). That bright line may in some sense be artificial. *Id.* But as long as mandatory LWOP sentences are constitutional, the line must be drawn somewhere. *Id.* And we may not move the line the United States Supreme Court has drawn.[7] *See Ray*, ¶ 171 (recognizing that, subject to the Eighth Amendment, "it is the legislature's prerogative to define crimes and punishments").

¶ 48 We acknowledge that some states have moved this line — either by statute or by judicial interpretation of their *state* constitutions. *See, e.g.*, *Commonwealth v. Mattis*, 224 N.E.3d 410, 415 (Mass. 2024) (holding that mandatory LWOP sentences for defendants under twenty-one years old violate state constitution); *In re Monschke*, 482 P.3d 276, 279-81 & n.6 (Wash. 2021) (noting that state constitution provides greater protection than Eighth

_____

[7] Apodaca notes that the Colorado legislature recently expanded eligibility for specialized sentencing programs previously available only to juveniles to young adults between the ages of eighteen and twenty. *See* §§ 17-34-101, 17-34-102, 17-22.5-403.7(1)(a)(III), C.R.S. 2025. But in doing so, it expressly excluded young adults sentenced to LWOP from these programs. *See* § 17-34-101(1)(a); § 17-22.5-403.7(1)(b), (2); *People v. Ray*, 2025 CO 42M, ¶ 177.

Amendment in juvenile sentencing context); *see also Ray*, ¶ 177 (citing cases). But as the supreme court noted in *Ray*, Colorado has not done so, and Apodaca makes no separate argument under the Colorado Constitution. *See Ray*, ¶ 177.[8] As to the bounds of the Eighth Amendment, we are bound by *Miller* and *Roper*.

¶ 49 Apodaca also asserts that his mandatory LWOP sentence is unconstitutional because of his "intellectual and psychiatric disabilities," including emotional and learning disabilities, a low IQ, and ADHD. But other than a general reference to *Atkins v. Virginia*, 536 U.S. 304, 321 (2002) — which prohibited *capital punishment* for individuals with "significantly subaverage intellectual functioning" and limitations on basic adaptive skills, *id.* at 308 n.3 — he cites no authority to support this argument. For the same reasons that we will not expand the *Miller* rule to a nonjuvenile, we see no basis to expand it based on Apodaca's low intellectual functioning.

¶ 50 Finally, Apodaca asks that, if we do not reverse his sentence outright, we remand the case for an evidentiary hearing on his as-

---

[8] Indeed, unlike Massachusetts and Washington, Colorado case law has *not* interpreted Colorado's constitutional prohibition on cruel and unusual punishments to provide greater protection than the Eighth Amendment. *See Sellers v. People*, 2024 CO 64, ¶ 36.

applied challenge. We decline to do so because Apodaca has not identified any relevant facts that need to be developed. His argument is based entirely on his age and, to some extent, his intellectual disability — neither of which we have concluded can render his statutorily mandated LWOP sentence unconstitutional.

## V.  Disposition

¶ 51    The judgment is affirmed.

JUDGE HARRIS and JUDGE BERGER concur.